EMMERLING v. FIRST NAT. BANK OF PEMBINA, N. D., et al.

(Circuit Court of Appeals, Eighth Circuit. November 6, 1899.)

No. 1,245.

1. BAILMENT—EVIDENCE OF REDELIVERY—ESTOPPEL OF BAILOR BY ACCEPTING RECEIPT OF ANOTHER.

In a suit against a national bank and its receiver to recover the value of securities claimed by plaintiff to have been held by the bank as her agent, it appeared without contradiction that plaintiff, who was a German woman, 60 years old, and with little knowledge of business, had caused the securities to be delivered to the bank, whose cashier receipted for them to her agent, under a verbal agreement with the president that they should be collected when due, and the proceeds kept reinvested by the bank for plaintiff, for a term of five years; that, after obtaining the securities, the bank notified plaintiff that it was necessary for her to indorse them, and that she had her brother come from her home in Manitoba for that purpose. The question at issue was as to whether at that time the bank redelivered the securities to plaintiff, and she turned them over to the president as an individual; and on such question there was some conflict of testimony. The securities were assigned by plaintiff as directed by the cashier, the assignments, so far as appeared, being in blank as to the assignee. The receipt then given plaintiff was on the letter head of the bank, but purported to be made by the president individually. Plaintiff and her brother testified that such receipt was handed to plaintiff in an envelope, and was at once sealed by the brother, and taken for safe-keeping, without being read, and that nothing was said about any change in the previous verbal agreement. The subsequent correspondence was conducted entirely between plaintiff and the bank through its cashier. On her request, he from time to time remitted her money from interest collected, sent her statements of the taxes paid for her by the bank, and one renewal note, subsequently taken, and sent to plaintiff, was made payable to and indorsed by the bank. Held that, the securities having admittedly been in the possession of the bank, it had the burden of proving a redelivery and intentional acceptance of them; that the receipt was not conclusive on plaintiff, but, if it was not read to her, and she was induced to accept it in the belief that it was the receipt of the bank, her rights against the bank were not prejudiced thereby; and the direction of a verdict for defendant based thereon was erroneous, the entire question of whether there was an actual redelivery of the securities and change of depository being one of fact for the jury, to be determined under all the facts shown.

2. CORPORATION—CONTRACTS—DEFENSE OF ULTRA VIRES.

The fact that a contract made by a national bank to receive and collect securities and reinvest the proceeds for the owner contained provisions which were ultra vires does not relieve the bank of the legal obligation to return the securities or account to the owner for their value.

In Error to the Circuit Court of the United States for the District of North Dakota.

Amelie Emmerling, the plaintiff in error, was a German woman, who, it was stated at the bar, talked and understood the English language somewhat imperfectly, and was inexperienced in business affairs and methods. She was 60 years old, and a widow. She was possessed of real-estate mortgages, notes, and bank stock of the par and of the actual value of $8,283.64. These securities were in the hands of Charles W. Andrews, who had given no security to Mrs. Emmerling, and, being uncertain as to his responsibility, and believing that she would incur less risk of loss if her securities were placed in the First National Bank of Pembina, N. D., she went from her home near Winnipeg, Manitoba, to Pembina, N. D., in August, 1889, for that purpose. Soon

after her arrival there, she was introduced to L. E. Booker, president of the bank, and she testifies that: "I spoke to Mr. Booker. I asked him if he wanted to take the business in hand as president of the bank. I addressed him as president of the bank. I told him that. He asked me why I was taking it out of the hands of Mr. Andrews, and I told him Mr. Andrews would not give me security, and I found myself unsecured, so I intended to put myself in the hands of the bank, and he, as president, to give it over to the bank, and to fix things as it ought to be. He asked me why I did not do it myself, and I said I was not a business woman, and could not do it. I told him in that conversation that under my arrangement with Mr. Andrews I was to have 8 per cent. on investments, and all over 8 per cent. Mr. Andrews was to have. Mr. Booker told me the bank would not take the stuff under five years, and during the five years, if I needed any money out of the interest, I could have it. Nothing was said to the effect that I was going to deal with him personally. I did not know Mr. Booker. I could not tell him to take my things personally, because I did not know him any more than I did Mr. Andrews." At the conclusion of their interview, Mrs. Emmerling executed and delivered to the bank the following order on Mr. Andrews:

"Charles W. Andrews, Esq.: Please deliver to First National Bank of Pembina any and all moneys, books, papers, deeds, notes, securities, and any other property of every kind and nature now in your hands or under your control belonging to me; the said First National Bank being hereby duly authorized by me to receipt for the same, and to make a full settlement with you for any business or other transaction previously done by you on my account.
                                        "Amelie Emmerling."

The bank presented this order to Mr. Andrews, and in compliance therewith, on the 15th day of August, 1889, he delivered the securities to the bank, taking the bank's receipt therefor. After arranging to have the bank take charge of her securities, and the execution of the order on Mr. Andrews to deliver the securities to the bank, Mrs. Emmerling returned to her home, where she remained for two months, and until informed that it was necessary to the proper conduct of her business for her to indorse or assign the securities, when she returned to Pembina for that purpose. Up to this point there is no testimony whatever in conflict with that of Mrs. Emmerling. There is some conflict as to what took place after Mrs. Emmerling went into the bank to indorse and assign the papers. Mr. Mager, her brother, who was with her in the bank at the time, testifies: "I was present during the time my sister was in the bank with Ryan and Booker. I have heard the testimony relative to notes, mortgages, and other papers turned over by plaintiff to the bank, and saw them all there at that time in the bank. Saw them on the table or desk in the bank room. Mr. Ryan produced the papers, and laid them on the table, and told my sister that she had to indorse them, and opened them up, and showed her where she had to sign. and she did so. He laid them on the table, and said, 'Here are all the papers,' and opened them up, turn about, for her signature. * * * After the papers were all signed, Mr. Booker handed the receipt over to Mrs. Emmerling. When handed over, the document was inside the envelope, but not sealed. Mr. Booker told Mrs. Emmerling, 'Here, Mrs. Emmerling, is your receipt.' She handed it right over to me. She sat right near the end of the table; said, 'John, you take care of this.' Q. Was that document read at that time by any one? A. No, sir; positively not. I sealed the envelope, and took it home, and put it in my safe. Exhibit D is the identical envelope this paper was in. Mr. Booker gave it to my sister, and she gave it to me. The indorsement was put on there a day or two after,—just as soon as I got home,—and I then put it in my safe. [The indorsement on the envelope reads as follows: "Receipt and order of Mrs. E. and from First Nat. Bk., Pembina."] I think the envelope was sealed in the bank by me. I did not read it at any time before I put it in my safe. I first opened the envelope five or six years ago, about four years after the transaction. I think the paper was in the envelope when Booker handed it to my sister. I am sure it was not taken out of the envelope at any time while my sister, Booker, Ryan, and myself were in the bank that day. It was not read to my sister or me, or either of us. During the time we were there in No-

vember, when the notes and mortgages were being signed, during the whole conversation had with Ryan and Booker, or either of them, regarding the notes or mortgages, nothing was said about their being turned over to Mr. Booker." When the envelope referred to by the witness was opened, it was found to contain a receipt reading as follows:

| | | | |
|---|---|---|---|
| "L. E. Booker, President. | | ⌈ | L. E. Booker. |
| "J. La Moure, Vice President. | | ⎮ | Judson La Moure. |
| "G. W. Ryan, Cash'r. | Directors ⎬ | ⎨ | O. H. Johnson. |
| "J. K. Musselman, Asst. Cash'r. | | | J. Bookwalter. |
| | | ⎮ | T. C. Shaw. |
| | | ⌊ | H. L. Holmes. |

"First National Bank.

"Capital, $50,000.00.

"Pembina, Dak., Nov. 4th, 1889.

"Received from Amelie Emmerling real-estate mortgage notes, chattel-mortgage notes, and bank stock in Cavalier County Bank, in all eight thousand two hundred and eighty-three and $^{64}/_{100}$, which I agree to account for and guaranty (8) eight per cent. per annum upon all of said notes, mortgages, and bank stock which are good and collectible. and guaranty Amelie Emmerling against loss from any loans made by me after the amt. is collected upon the loans already made.                                    L. E. Booker."

Mrs. Emmerling corroborates her brother in every respect, and testifies: "They told me they wanted me to assign some of the papers. None of those papers, mortgages, notes, or other papers were handed to me. They were on the table when I saw them. Somebody brought them and put them on the table. They were handed to me one at a time to sign. I signed certain assignments. Nothing was said that day, while I was at the bank, about my dealing with Booker personally. There was no agreement or understanding at the time that I was dealing with Booker personally. I was dealing with the bank. While I was there, there was a receipt given, but I don't know where it is. I can't remember who handed it to me. * * * It was not read to me. When it was handed to me it was not opened up so that it could be read by me. I think it was folded up. They put an envelope over it. I handed it over to my brother when he came. He was not there at the time. I did not take it out of the envelope. At that time I had no knowledge whatever that any claim was made that I was dealing with Booker personally. I did not at that time consent to deal with Booker personally."

G. W. Ryan, the cashier of the bank, testifies that: "I delivered them [the securities] to Mrs. Emmerling just as I received them from Mr. Andrews, in an envelope. When she came into the bank, I gave those papers to Mrs. Emmerling in a bunch, in an envelope. I showed her where to sign on the assignments, but as to the other signatures I can't say. Some of the assignments were left blank at that time, but would not say whether all were or not. I would not be positive that the assignee's name was put in any of the assignments. Mrs. Emmerling simply told me she was turning those papers over to Booker. Nothing said about the bank nor president. I understood the order was given to the bank in the first instance, and was told that it was in pursuance of an arrangement with Booker. I understood from the order the papers were to be delivered to the First National Bank, and I gave the receipt of the First National Bank for them. While Mrs. Emmerling and Mr. Booker were in the bank, I did not know anything about a new contract. There was a contract being made between them at that time for those papers."

Mrs. Emmerling returned to her home, and from time to time thereafter would request the bank to send her funds out of the collections made on her securities. These requests, beginning February 4, 1890, and continuing until July 16, 1896, were always honored by the bank sending her its check for the amount desired by letter. These letters were written on the letter heads of the bank, and signed officially by G. W. Ryan, the cashier of the bank. They are alike except as to dates and amounts. The following is a copy of one of them:

"L. E. Booker, President.
"J. La Moure, Vice Prest.
"G. W. Ryan, Cashier.
"J. K. Musselman, Ass't Cash'r.    Directors

L. E. Booker.
Judson La Moure.
O. H. Johnson.
J. Bookwalter.
T. C. Shaw.
H. L. Holmes.
H. Charlton.

"First National Bank.
"Capital, $50,000.00.

"Pembina, Dak., Aug. 19, 1891.
"Mrs. A. E. Emmerling—Dear Madam:   As requested in yours of the 17th, herewith inclose our check for $100.
"Yours,                                                    G. W. Ryan, Ca."

The bank also paid taxes for Mrs. Emmerling, and reported the payment by letter written on the bank's letter head, and reading as follows:

"Pembina, N. Dak., July 16, 1896.
"Mrs. Emmerling—Dear Madam:   The bank has paid taxes as follows for you:  *  *  *.                                         G. W. Ryan, Ca."

From 1889 until the failure of the bank there was no suggestion made by the bank or any one to Mrs. Emmerling that Booker personally had anything to do with her securities, and she rested secure in the belief that the bank had them, and that they were safe there. There was some other testimony, but what we have set out comprises the most material part of the evidence, and is quite sufficient to · dispose of the case in this court. After the bank failed, Mrs. Emmerling presented her claim for her securities to the receiver of the bank, who refused to allow the same. She thereupon brought this suit against the bank and its receiver to recover the value of her securities. The answer of the defendant was a general denial of the averments of the complaint. At the trial the defendants made two contentions:  First, that the securities were not left with the bank, but with L. E. Booker, the president of the bank, in his individual capacity; and, second, that, if they were left with the bank, the contract was ultra vires the bank, and the bank was not liable either to return the securities or to account for their value. At the close of the testimony in the case, the court, on motion of the defendants, "directed the jury to return a verdict in favor of defendants and against the plaintiff upon the grounds stated by the court:  First, that the evidence submitted showed that the contract referred to in plaintiff's complaint and in the testimony was made personally with L. E. Booker, and not with the defendant bank; and, second, that the contract referred to in the complaint and the evidence was ultra vires the bank, and therefore not binding on the defendants.—to which ruling the plaintiff duly excepted." The jury returned a verdict in accordance with the instructions of the court, and the plaintiff sued out this writ of error.

Tracy R. Bangs (Charles J. Murphy, on the brief), for plaintiff in error.

Guy C. H. Corliss (W. J. Kneeshaw and J. M. Cochrane, on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

At the threshold of this case we find some very important facts established by uncontested testimony; among them these:  That Mrs. Emmerling made a contract with Booker, as president of the bank, for the bank to take and handle her moneys and securities on certain terms, and that in pursuance of that contract she gave the bank an order on Andrews for the securities, and that the bank obtained the

securities on that order. These facts are not contested in the evidence. Booker does not come forward to deny them, for the reason, as was stated at the bar, that he has fled the country to escape punishment for his fraudulent and illegal use of the funds of the bank, which brought about its failure. That the contract made by Mrs. Emmerling with Booker, as president of the bank, contemplated that the bank was to do much more than merely to receive the securities for safe-keeping, is shown by the terms of Mrs. Emmerling's order on Andrews to turn the securities over to the bank. This order not only authorized the bank to receipt to Mr. Andrews for the securities, but "to make a full settlement with you [Andrews] for any business or other transaction previously done by you on my account." Excluding the receipt, which we will consider later, the overwhelming weight of evidence is against the defendants' contention that Mrs. Emmerling wittingly and knowingly revoked the bank's agency, and withdrew her securities from its possession, and appointed Booker her agent, and turned the securities over to him individually. We are brought at once, therefore, to the consideration of the question whether the delivery of the receipt signed by Booker to Mrs. Emmerling, under the circumstances detailed in the evidence, estops her from showing that she never did withdraw her securities from the bank, and place them in the hands of Booker. The fact being clearly established that the bank received and had possession and control of these securities for Mrs. Emmerling, and as her agent, the burden of proof rested upon the defendants to show that this agency had been revoked, and the securities returned by the bank to Mrs. Emmerling. Mrs. Emmerling did not go into the bank to make any change in the custody of her securities, but to indorse them in blank, for the purpose, as she supposed, of enabling the bank to collect them. It is now apparent that the purpose of the bank officers in procuring these indorsements was to enable the bank, or its officers, to make fraudulent use of her securities, as was done. Down to the time these indorsements were made, Mrs. Emmerling had received no receipt from the bank for her securities. She was entitled to such receipt, and had a right to expect it; and when the president of the bank said to her, "Here, Mrs. Emmerling, is your receipt," she had a right to suppose it was the receipt of the bank, and no one else. She had not delivered her securities to Booker, but to the bank. She was impressed with the idea that her securities and money would be much safer in the bank than in the hands of any private individual. It was this notion that induced her to transfer the securities from Andrews to the bank. Booker was a stranger to her. She knew nothing about him or his responsibility. It is highly improbable, therefore, that, after taking the securities from Andrews, and putting them into the possession of the bank for greater security, she would immediately take them out of the bank's possession, and place them in the hands of an individual of whose honesty and responsibility she knew nothing, and who, as subsequent events proved, was wholly untrustworthy. She and her brother testified that the receipt was not read by or to her at any time; that it was handed to her in an envelope, and handed by her to her brother, who sealed the envelope, who

took it to his home, and placed it in his safe, first making an indorsement on the envelope to the effect that it contained the receipt of the bank to Mrs. Emmerling for the securities. It is true, Ryan, the cashier of the bank, testifies that when Mrs. Emmerling came into the bank he "delivered" the securities to her; but she did not go into the bank to have the securities "delivered" to her, but to indorse them, and, if they were handed to her at all, it was for that purpose. They were immediately spread out upon the table, and Ryan himself proceeded to instruct and direct Mrs. Emmerling where and how to sign her name to blank indorsements. It is obvious that, if the papers were handed to her as testified to by Ryan, they were not "delivered" to her in the sense that she received them in execution of a purpose to revoke the agency of the bank, and take the papers out of its possession. If the papers were handed to her at all, it was not for any such purpose as that. The cashier could not have understood that the bank had ceased to be Mrs. Emmerling's agent, for he dealt and corresponded with her about the business connected with these securities in the bank's name, and in his official capacity, for years thereafter. The name of Booker was never used. Any other view lays the cashier open to the suspicion that, knowing that the individual receipt of Booker had fraudulently been palmed off upon Mrs. Emmerling as the receipt of the bank, he continued to carry on the business in the name of the bank and in his official capacity for the purpose of keeping Mrs. Emmerling from discovering the fraud. In a case where it was claimed that a paper had been "delivered" to a party, somewhat after the manner of the alleged delivery of this receipt to Mrs. Emmerling, the supreme court of Vermont said:

"This presents the question as to what is a delivery. It is, in its legal acceptation, something more then merely change of manual capacity or possession. That may or may not be a delivery, according to the intent of the parties. It is a question of intent and purpose; of mutual intent and purpose, implying an acceptance as well as delivery." King v. Woodbridge, 34 Vt. 565.

This business was done in the bank, with an officer of the bank, concerning securities previously placed in the possession of the bank, and for which Mrs. Emmerling was entitled to a receipt from the bank. The receipt was written in the bank, by an officer of the bank, with whom individually Mrs. Emmerling had never had any business relations whatever. It was written on a gorgeous letter head of the bank, and signed by the president of the bank. Under these circumstances, few business men, to say nothing of an old lady having no knowledge or experience of business, would have thought it necessary to examine the receipt critically, even if it had been shown to them, to see if the president of the bank had followed his signature with the title of his office, which appeared at length and conspicuously at the head of the receipt.

It is highly probable that Mrs. Emmerling's and Mr. Mager's version of what was said and done with reference to this paper is the true one. But, however that may be, upon the evidence the court should have left it to the jury to say whether the bank had delivered the securities to Mrs. Emmerling, and she had accepted them with the mutual intent and purpose on the part of the bank and Mrs.

Emmerling to revoke the bank's agency, and to permanently withdraw the securities from its possession and control. The court should have told the jury that, if the receipt was not read to her, and she was induced to take it in the belief that it was the receipt of the bank, then the fact that it was signed by Booker in his individual capacity would not prejudice her claim against the bank. Cases similar to this have frequently arisen, and the rule of law applicable to them is well settled.

In the case of Strohn v. Railway Co., 21 Wis. 562, the plaintiff had a verbal agreement with the defendant railway company as to the terms of shipment of a quantity of freight. The freight was delivered to the railway company, and afterwards, upon demand, the company delivered to the plaintiffs bills of lading therefor. These bills of lading contained conditions of shipment inconsistent with the verbal agreement of the parties. The plaintiffs having received and retained these bills of lading without reading them or knowing their contents, the railway company insisted that they were bound by the conditions contained in the bills of lading, which had been received without objection. In answer to this contention, the court said:

"Of course, possession of the paper by the party is evidence, more or less strong, according to the particular circumstances, of his assent to the conditions contained in it. In most cases it may be absolutely conclusive. If it should appear that he examined it, and knew the contents, and then kept it, instead of returning it or offering to return it to the company, or notifying the company of his dissent, such acquiescence would, no doubt, be construed as conclusive evidence of his assent. But where the paper is not examined, and the contents not known, I do not think the same circumstances follow. Nor do I think that the party is bound to examine the paper at once, and know the contents, and return it to the company, or give immediate notice of his dissent, at the peril of being held concluded on the ground of acqui escence or neglect. Having previously entered into a special verbal agreement, he may rightfully assume, in the absence of notice to that effect, that it is embodied in the paper or receipt, or at least that the receipt contains nothing contrary to it. It is in the nature of a direct fraud or cheat for the company or its agents, after having entered into a verbal agreement, thus wrongfully to insert a contract of an entirely different character, and present it to the party, without directing his attention expressly to it, and procuring his assent. It is no answer for the company in such a case to say that the other party should have been more diligent and watchful, and should have detected the fraud. So long as he is ignorant of the new conditions, and does not assent to them, the contract in writing is not consummated, and parol evidence may be received."

And to the same effect is Boorman v. Express Co., 21 Wis. 154. And where the plaintiff took his money to a bank, and handed it to the cashier for deposit in the bank, and the cashier gave him a certificate of deposit in the name of a firm in which the bank officers were largely interested, the court said:

"When the plaintiff took his money to the First National Bank of Allentown, and handed it to the cashier for deposit, the bank became responsible therefor. The cashier was the executive officer of the bank, and authorized, by the very nature of his office, to receive money on deposit. After receiving it, no trick or fraud on his part, by means of which the money was passed over to Blumer & Co., a firm in which the bank officers were largely interested, and appeared to have had the control, could absolve the bank from its liability. No class of men have the confidence of the people to a greater extent

than bank officers. Depositors do not deal with them at arm's length, and can be imposed upon with the greatest ease by such officials. It would be monstrous to allow them to take advantage of the ignorant and unwary by reason of their position and the confidence which it inspires. It was doubtless a misfortune to this bank to have unworthy officials, if such should prove to be the case. It certainly was unwise to permit its chief officers to occupy a dual position, with divided interests; but the consequences resulting therefrom cannot be visited upon those who dealt in good faith with the bank. It was error to reject the evidence contained in plaintiff's offer. The facts offered to be proved amounted to a fraud upon the plaintiff, and he was entitled to have that question passed upon by a jury." Ziegler v. Bank, 93 Pa. St. 397.

In a similar case against the same bank the court said:

"We must assume that the jury would have found the facts as testified to by the plaintiff Steckel. The facts established, we have a case of palpable fraud. It is not an answer to say the plaintiffs ought not to have been deceived, and, with ordinary care, would not have been. The fact that the Blumers were respectively president and cashier of the national bank, as well as leading members of the banking house of Blumer & Co., was calculated to mislead and deceive; and when told in positive terms that the certificates, although signed by Blumer & Co., were the certificates of the bank, the plaintiffs may readily have believed it was all right. * * * The question of fraud should have been submitted to the jury." Steckel v. Bank, 93 Pa. St. 383.

And in a case where the cashier of a bank had signed his name to a receipt without the addition of the word "cashier," and the money was credited to the cashier's private account, and the bank denied liability, parol evidence was permitted to prove that in fact it was a bank transaction, and the court said:

"A question is made that Pomeroy, by signing his name to the receipt for the $1,300 without the addition of the word 'cashier,' implied that it was his individual contract. But, as it was dated at the bank, it was, at most, a case of doubt, upon the face of the receipt, whether it was a private or official act. In such a case parol evidence was admissible to show that it was an official act, though the money was credited on the books of the bank to the cashier's private accounts. Mechanics' Bank of Alexandria v. Bank of Columbia, 5 Wheat. 326, 5 L. Ed. 100. And it was properly left to the jury to decide, under the circumstances of the case, whether the contract was that of the bank or of the cashier in his individual capacity. The evidence, on the face of it, therefore, predominates in favor of its being a bank transaction." Caldwell v. Bank, 64 Barb. 350.

Where the lower court took a case from the jury, saying, "There was very little discrepancy in the testimony," the supreme court reversed the judgment, and said:

"The judge also tells us that there was very little discrepancy in the testimony; but where there is any discrepancy, however slight, the court must submit the matter to which it relates to the jury, because it is their province to weigh and balance the testimony, and not the court's." Barney v. Schmeider, 9 Wall. 248, 19 L. Ed. 648.

In the case at bar a peremptory instruction to the jury to find for the plaintiff would have accorded with the evidence much better than the instruction that was given. But the case should have gone to the jury, whose exclusive province it is to determine controverted questions of fact.

The court erred also in instructing the jury that the plaintiff could not recover because the contract was ultra vires the bank.

Assuming that the contract by which the bank received the plaintiff's securities, and agreed to collect them and reinvest the money for five years, and accept as its compensation therefor all interest received in excess of 8 per cent., was ultra vires the bank, the bank is nevertheless under obligation to the plaintiff to return the securities, or account for their value. American Nat. Bank of Denver v. National Wall-Paper Co., 40 U. S. App. 646, 23 C. C. A. 33, 77 Fed. 85, and authorities there cited. As was said by this court in the case cited, "This doctrine has become familiar learning." The doctrine as here applied is not at all shaken by the late decisions of the supreme court. On the contrary, in one of those cases that court, speaking by Mr. Justice Gray, says:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money parted with on the faith of the unlawful contract to be recovered back, or compensation to be made for it." Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 35 L. Ed. 55.

The judgment of the circuit court is reversed, and the cause remanded, with instructions to grant a new trial.

SANBORN, Circuit Judge. I concur in the result in this case, not because Mrs. Emmerling was ignorant of the contents of the receipt which Booker gave her, for I think she was charged under the law with knowledge of its contents (Railway Co. v. Belliwith, 55 U. S. App. 113, 119, 28 C. C. A. 358, 361, 83 Fed. 437, 440; Green v. Railway Co., 35 C. C. A. 68, 70, 92 Fed. 873, 876, and cases there cited), but because, while that receipt is persuasive, it is not conclusive, evidence that a contract with the individual Booker was substituted for the original agreement with the bank, in view of the letters which the bank wrote, and the reports and remittances which it made to Mrs. Emmerling after the receipt was given, and in view of the facts that Mrs. Emmerling's Laidlaw note was renewed in December, 1889, by a note payable to the bank, and this renewal was subsequently indorsed by the bank, and delivered to the plaintiff in error. These acts of the bank subsequent to the delivery of the receipt tend so strongly to show that it was still the depositary of the securities and the trustee of Mrs. Emmerling that the question whether it was or not should have been submitted to the jury.