JOHN BRANDENBURG, Appellant, v. FIRST NATIONAL BANK OF CASSELTON, NORTH DAKOTA, Respondent.

(183 N. W. 643.)

**Fraud — special verdict for plaintiff in action against national bank held supported by evidence.**

1. In an action for fraud and deceit by a National Bank concerning the negotiation and sale of a real estate mortgage, it is *held*, for reasons stated in the opinion, that the special verdict, favorable to the plaintiff, finds support in the evidence.

**Banks and banking — national bank forwarding note and mortgage for collection held to act intra vires.**

2. A National Bank receiving for custody, care and collection a note and mortgage of its customer and thereafter forwarding the same for collection is acting intra vires and liable for breach of its duty.

**Banks and banking — national bank receiving proceeds of note and mortgage with authority to pay upon a first mortgage lien on real estate held to act intra vires.**

3. A National Bank receiving the proceeds of a customer's note and mortgage with authority to pay out the same upon a first mortgage lien upon real estate is acting intra vires and liable for breach of its duty.

**Banks and banking — bank liable for fraud of president investing proceed of customer's note in worthless mortgage.**

4. Where a president of a National Bank, pretending to act as such, fraudulently and deceitfully made representations to the customer of the bank concerning the character of a pretended first mortgage lien and

thereby occasioned the proceeds realized upon a note belonging to the bank's customer to be paid and invested in a worthless mortgage the bank is liable for the fraud and deceit practised although it received no benefit, and its officer's acts were ultra vires.

Opinion filed June 6, 1921.

Action in District Court, Case County, *Cooley, J.* From a judgment of dismissal the plaintiff has appealed.

Reversed.

*Lawrence, Murphy & Nilles,* for respondent.

*Pierce, Tenneson, Cupler & Stambaugh,* for appellant.

National banks have power to receive special deposits and their officers have authority to bind the bank by agreements made in relation thereto. First Nat'l. Bank of Carlisle v. Graham, 100 U. S. 699; 25 L. ed. 750; 36 Am. Rep. 592; McCormick v. Market Nat'l. Bank; 165 U. S. 538; 41 L. ed. 817 Minn. Mutual Life Ins. Co. v. Tagus, 34 N. D. 566; 158 N. W. 1063; L.R.A. 1917A 519; Citizens Nat'l. Bank v. Davisson, 229 U. S. 213.

The lending of money for its customers is an every day transaction with all banks, and it has been held that for negligence or for fraud and deceit in selection of investments for its customers, the bank is liable for the acts of its officers who represented it in the transaction. 7 C. J. 719 and cases cited in notes 90 to 95.

It is well settled that a corporation cannot escape liability upon a plea that the tortious acts were ultra vires.

"It is the policy of the law to look with disfavor upon the defense of ultra vires, especially when interposed by a corporation to avoid an obligation otherwise legal and equitable. It has been said by an English judge that "the safety of men in their daily contracts requires that this doctrine should be confined within narrow bounds." 3 Fletcher Cyclopedia Corporations, § 1520, p. 2581. Seeber v. Commercial Nat. Bank, 77 Fed. 957, 960.

Corporations have been held liable in these cases by attributing to them the conduct of their agents:

Assault and battery with a deadly weapon by a railroad company.

(Railway v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. ed. 1146).

Libel by a railroad company, (Railroad v. Quigley, 21 How. 202, 1 L. ed. 73.)

Fraud and deceit, assault and battery, malicious prosecution, nuisance and libel, (National Bank v. Graham, 100 U. S. 699, 702, 25 L. ed. 750.)

Fraud by a municipal corporation in reports of distilled spirits to revenue collector, (Salt Lake City v. Hollister, 118 U. S. 256, 6 Sup. Ct. 1055, 30 L. ed. 176.)

Fraud and deceit by a manufacturing company, (Butler v. Watkins 13 Wall, 457; 463, 20 L. ed. 629.)

Maintenance of a nuisance, (Railroad v. Baptist Church, 108 U. S. 317; 2 Sup. Ct. 719; 27 L. ed. 739.)

Assault and battery by an express company, (Southern Ex. Co. v. Platten, 36 C. C. A. 46; 93 Fed. 936.)

Malicious prosecution by a manufacturing company, (Copley v. Sewing Machine Co., 2 Woods 494; Fed. Cas. No. 3213.)

Boycotting by a corporation of which the members were mercantile firms, (Hartnett v. Plumber's Supply Assn. 169 Mass. 229; 47 N. E. 1002 38 L.R.A. 194.)

Malicious prosecution by a savings bank, (Red v. Home Savings Bank, 130 Mass. 443; 39 Am. Rep. 469.)

It is also well settled that a corporation cannot escape liability upon a plea that the tortious acts were ultra vires. Citing in support the following authorities:

Railroad v. Quigley, 21 How. 202; 16 L. ed. 73. Merchants Bank v. State Bank, 10 Wall. 604; 645, 19 L. ed. 1008. County of Calhoun v. Emigrant Company, 93 U. S. 124; 130; 23 L. ed. 826. National Bank v. Graham, 100 U. S. 699, 702, 25 L. ed. 750. Salt Lake City v. Hollister, 118 U. S. 256; 6 Sup. Ct. 1055 30 L. ed. 176. Railway v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286; 30 L. ed. 146; Railway Co. v. Howard, 178 U. S. 153; 160; 20 Sup. Ct. 880 44 L. ed. 1015. Alexander v. Relfe, 74 Mo. 517.

"Corporations are liable for every wrong they commit, and in such cases the doctrine of ultra vires has no application."

"They are also liable for the acts of their servants while such servants are engaged in the business of their principal, in the same manner and to the same extent that individuals are liable under like circumstances."

Merchants Bank v. State Bank, 10 Wall 604; 19 L. ed. 1008. Ultra

vires is no defense to an action for fraud and deceit. Morawetz on Private Corporations, §§ 726-7. Morse on Banks and Banking, (4th Ed.) § 727.

"The proposition is sustained by the authorities that a corporation may be charged with any wrong that may be committed through an agent, and may be held liable for any damages caused by his deceit or false representations. In such case the doctrine of ultra vires has no application." Dorsey Mach. Co. v. McCaffey, 139 Ind. 545; 38 N. E. 208; 47 Am. St. Rep. 290 cited by the court.

"There is no rule of law which requires men in their business transactions to act upon the presumption that all men are knaves and liars, and which declares them guilty of negligence, and refuses them redress, whenever they fail to act on that presumption." Strand v. Griffith, 97 Fed. 856-7. 12 R. C. L. 360. Pronger v. Old National Bank, 56 Pac. 391 (Wash.)

"If the officer purports to represent the bank in making reply to the inquiry, the inquirer has a right to rely upon the statement as being the statement of the bank, and "ultra vires" will not shield the bank from liability for the officer's fraud. Such is the holding of the courts. Nevada Bank v. Portland Nat'l. Bank, 59 Fed. 338. Hindman v. First Nat'l. Bank of Louisville, 98 Fed. (6th Cir.) 562; 39 C. C. A. 1; 48 L.R.A. 210, opinion by Taft, Judge. Same case 112 Fed. 931, on second appeal opinion by Lurton, Judge.

"It is enough to entitle plaintiff to recovery if the false representation complained of was a material inducement to the contract or transaction which occasioned the jury, although there may have been other co-operating inducements." Sioux National Bank v. Norfolk State Bank 56 Fed. 139.

*Lawrence, Murphy & Nilles,* for respondent.

One who deals with the President of a National Bank in a transaction known to be outside the legitimate sphere of its administration, has no right to presume that the act of the officer has been sanctioned by the Board of directors or other governing body as an act done by an officer of such bank in furtherance of his business venture which is in excess of the corporate powers cannot be said to be an act which is within the scope of the customary powers of such officer. Bank v. Smith, 77 Fed. 129; Bank of Manistee v. Bank of Milwaukee, 83 Fed. 725; Gas

Company v. Lansden, 172 U. S. 534; 43 Law. ed. 543; Wilkin-Hale Bank v. Herstein, 149 Pac. 1109.

It is elementary of course that false and fraudulent representations for which any principal is responsible when made through an agent must have been made in the course of his service for the principal or by the principal's authority. In Gas Company v. Lansden, 172 U. S. 534; 43 L. ed. 543.

That a transaction which is ultra vires is void and that no rights grow out of it and no liability is incurred in such transaction except that if the corporation or its agents have received money or property in such unlawful transaction and an accounting must be made therefor. Bank of Manistee v. Bank of Milwaukee, 83 Fed. 725; Wilkin-Hale Bank v. Herstein, 149 Pac. 1109; Commercial Bank v. Pirie, 82 Fed. 799; Merchants Bank v. Baird, 160 Fed. 642.

### Statement.

BRONSON, J. This is an action to recover damages for fraud and deceit in the sale and negotiation of a real estate mortgage. The complaint alleges that the defendant, through deceitful and fraudulent practices, loaned $2,000 of plaintiff's money, in its custody, upon a worthless real estate mortgage. The answer asserts that the transaction was a brokerage transaction and was ultra vires, under the National Banking Act (13 Stat. 99).

The action was submitted to a jury upon a special verdict comprising 56 questions. The verdict was favorable to the plaintiff. The plaintiff thereafter moved for judgment upon the special verdict. The defendant likewise moved for judgment in its favor upon the special verdict, or, in the alternative, for judgment notwithstanding the verdict. The trial court denied the motion of the plaintiff and made an order dismissing the action with prejudice. Judgment was so entered. The plaintiff has appealed. The facts are substantially as follows:

For many years, from 1891 to 1906, the plaintiff resided in Arthur, a town tributary to Casselton, engaged in the mercantile business. During this time he did a banking business with the defendant. He had a checking account, a merchandise checking account, and an account of borrowed money. The checking account extended from 1891 to 1908, and the loan account from 1891 until it was closed in 1905. R. C. Kittel was the president of the bank for some 10 or 12 years prior to the latter part of No-

vember, 1915. He was actively in charge of the business of the bank generally. The plaintiff became acquainted with Kittel after Kittel's connection with the bank. In 1906, the plaintiff, retiring from business, removed to his former home in Lebanon, Ohio. He continued to do business with the bank. He left certain moneys upon time certificates of deposit. Other moneys were paid into the bank to his credit. Later, when the time deposits matured, he received payment and then left $2,000 in the bank to be loaned for him upon real estate. The concern of this action is the manner in which this $2,000, left with the bank, was handled. The defendant went into the hands of a receiver in December, 1915, but thereafter it was reinstated and has since continued as a national bank. The correspondence between the parties is voluminous; it dates from 1906 to about 1915; it is largely between the plaintiff and R. C. Kittel, the president of the bank; some is with one Weiser, cashier. There is an occasional letter from others connected with the bank. The correspondence to the plaintiff is upon the stationery of the bank. The great majority of the letters are signed by R. C. Kittel, president. Some are simply signed R. C. Kittel. Some of the letters written by the plaintiff were addressed to R. C. Kittel. The plaintiff testifies, however, that he never had any personal dealings with the officers of the bank; that he addressed his envelopes to the bank, to its cashier, or to its president. It is deemed necessary for the consideration of the issues to state substantial portions of this correspondence.

In August, 1906, Kittel, president, wrote the plaintiff that they were making out five new certificates of deposit and filing the same in the vault subject to plaintiff's order. In March, 1907, Kittel, president, wrote plaintiff that the defendant bank, in his estimation, was as strong as any in the whole country; that plaintiff's money with the bank was as safe as with any bank in the United States; and that they would be glad at all times to look after his business. In October, 1907, Kittel wrote plaintiff that, if he would like a good loan for a thousand or two at a fair rate of interest, he would be very glad to get one for him either on land or on some property in Arthur. In November, 1907, he wrote that he could get some very nice loans secured on mortgages on farms which would net 6 per cent.; that "we supply a good many of our customers here with different forms of investments," and that in view of his being an old customer they would be glad to extend the same services to him. This letter is signed by Kittel, personally, and is on the bank stationery. Again, in November, 1907, he wrote suggesting a particular loan. In December,

1907, he wrote concerning the Ellsbury loan; inclosing an application, he stated that it would be a good loan and that, if plaintiff wanted the money on the loan next fall, he would be very glad to take it off his hands; that, if he wished, his letter might stand as his agreement on that point. This was signed by Kittel, president. In the same month, the cashier, Weiser, wrote, inclosing three time certificates amounting to $1,200, and charging plaintiff's account with such amount. In the same month Kittel, president, wrote, inclosing the Ellsbury first mortgage note for $2,000, with interest coupons and stating that if he contemplated selling the same back to us next summer, he should leave the indorsement on the back in blank and not record the assignment; that when he was ready to sell it back all he would have to do would be to take back the papers and destroy the assignment. In January, 1908, one Knight, upon bank stationery, wrote, inclosing the Ellsbury mortgage deed.

In March, 1908, plaintiff wrote Weiser, cashier, inclosing time certificates amounting to $3,700 and Ellsbury note for $2,000, requesting that the package be put in the bank safe for safe-keeping. He advised that he sent them to the cashier instead of Kittel because Kittel seemed to be away a good deal of the time. In April, 1908, the cashier replied, acknowledging receipt of certificates and the note, and requesting plaintiff to call on him any time he could be of service. In December, 1908, Kittel wrote:

"We will attend to the collection and remittance on the Ellsbury interest coupon."

In November, 1909, plaintiff wrote Kittel, president, to collect and remit interest on Ellsbury coupon note of $130 in the bank's possession. Likewise, in November, 1910, plaintiff wrote Weiser, cashier, to detach Ellsbury interest coupon and send it to the Lucca Bank for collection and remittance to him. In response to this letter Kittel, president, in December, 1910, wrote that the coupon had been sent to the Lucca Bank with instructions to remit direct to plaintiff, and also advised that in addressing any communications in the future he had better address them simply  to him or to the bank and they would have their prompt attention. In December, 1911, Kittel, president, wrote that he had detached the Ellsbury interest coupon and was sending it to Lucca for collection; that he would advise as soon as it was paid. In November, 1912, Kittel, president, wrote that the Ellsbury loan would be due on December 1st; that "renewal is desired"; that he should be very glad to make them a new loan, but desired to give plaintiff the preference; that Ellsbury had been quoted a rate

of 6 per cent., but he preferred "to do business with us." In November, 1912, plaintiff wrote Kittel in reply that if Ellsbury wished to renew at 6½ per cent. she could do so. Kittel promptly answered that he did not believe he could secure 6½ per cent. interest; that if he would like a better interest return he could get some good loans through a bank at Towner; that he would look after these loans the same as any loans from Casselton or Lucca; that he would expect to investigate the security, the papers, and the title, and to "look after the principal and collection of interest for you" until the loan was fully paid. In December, 1912, plaintiff wrote Kittel that he would renew Ellsbury loan at 6¼ per cent.; otherwise, "they may pay it in to you and I will place it elsewhere pretty soon." In December, 1912, Kittel, president, answered that Ellsbury would not accept proposition; that he would draw satisfaction of the mortgage and send it to plaintiff and plaintiff could execute it and "send it to us for collection." In this letter he further wrote about some loans at Towner and about splitting commission, so as to net 6½ per cent.; that—

"if you want me to get you a couple loans to take the place of the Ellsbury loan I will get them, and just as soon as the interest stops on the Ellsbury loan it will begin on the other loans for you. Any loans that I sell you will be handled by the bank here; we look after the collection and remittance of interest and attend to the loans for you until it is finally paid and discharged."

Plaintiff answered this letter by stating the proposition to reloan the Ellsbury loan at 6½ per cent. annual interest would be satisfactory; that he wanted abstracts showing first mortgages duly approved by Pollock or Callahan. He trusted that in replacing of loan he would get it on land that was enhancing in value. This letter was addressed to Kittel, president. In January, 1913, Kittel, president, wrote that he would procure for him one or two good loans to take the place of the Ellsbury loan; that he might rest assured "that whatever loans I take on and put my money into and then sell over to you are good loans and well secured"; that "the Ellsbury loan proceeds will be deposited in the First State Bank of Lucca and they will allow you interest on the money while it is there and until I can get you a new loan." On November 28, 1913, Kittel, president, wrote:

"I was under the impression that the Ellsbury loan had been paid and a new loan obtained for you. Evidently this is not the case. The Ellsbury loan is now past due and should be cleaned up."

On the same day he wrote another letter about some mortgages on

wild lands in Billings county, one for $2,500 and the other for $3,000. Plaintiff responded by not accepting such mortgages and stating that he had concluded it best for him (Kittel) to reloan the $2,000 Ellsbury loan upon real estate at not less than 6½ per cent.   In January, 1914, Kittel, president, wrote, inclosing note of the Alfalfa Valley Land Company for $2,000, payable December 1, 1919, at 7 per cent. interest since December 1, 1913. He stated:

"I got you this loan in place of the Ellsbury loan. I have had some trouble in getting you a loan to net 7 per cent. that I would recommend. This loan is well secured on a good quarter section in Pierce county, N. D. The mortgage in your favor has been sent up for record, and when it is returned we will register it here and forward it to you. The interest for last year I will have to check up. We are a little mixed up with Lucca as to just what we are to get from Ellsbury."

Plaintiff responded by returning the note and stating the loan was not satisfactory; that he did not expect to make a loan and have the papers made out without first laying the proposition before him; that the loan was too long, as he was 68 years old; that he and his wife were not in good health; that if he accepted the loan he would want an agreement from him as president of the bank to cash this loan or resell it at any time that he would wish and to pay to him the full value of the loan; and he would want to know that the real value of the land far exceeded the value of the mortgage. In this letter he also stated that he wanted to know whether the land was wild or improved, whether the land was level or hilly, who this land company was, and why the head officers of the land company did not sign the notes. On January 30, 1914, Kittel, president, answered:

"I have been looking around for you during the last year to get you a loan that I could recommend and that would bring you 7 per   cent. interest."

"W. F. Kittel and myself shall be glad to give you an agreement in writing to take this land off your hands December 1, 1916, or on any interest payment date thereafter, if you or Mrs. Brandenburg request us."

"Ordinarily, we would not do this; when we sell loans we sell on its merits and we simply do the best we can"; that this land company owned some 25,000 acres of land in McHenry county; that he handled most of their business down here; that the secretary and treasurer is spending the winter in Europe; that the assistant secretary and assistant treasurer were

authorized under the by-laws to execute notes and mortgages; that the land was level land, good medium soil, was all under cultivation, and was worth $4,800; that he had personally seen this land; that he would hold the note and original mortgage there and file it away for safe-keeping; that he might rest assured that he had secured a good loan; one that will pay its interest and principal promptly and one that is well secured.

In response plaintiff wrote Kittel, president, that he did not doubt his best intentions to serve plaintiff's best interests; that "you did not give me a description of the land"; "we well know that if you live and continue at the head of the First National Bank of Casselton our interests there would be safe, but it occurred to us that something might happen to bring forth your successor and that our interests might suffer"; that "your proposition and description of this land in yours of January 30th is very satisfactory"; that he was glad to know that he had personally seen the land. He requested that Kittel and W. F. Kittel make up an agreement to take up the loan as proposed.

"Taking it for granted you have been furnished with abstract duly approved by a competent attorney showing the Alfalfa Valley Land Company have a legal title to this land, I would like to see the mortgage papers when completed and will return them to you for safe-keeping."

On February 11, 1914, Kittel, president, wrote, inclosing agreement to repurchase the loan, stating that the abstract was being brought down to date, that it was approved by Mr. Callahan; that he would be glad to send them to him for examination, together with the mortgage, when they came back from the register of deeds. He further stated:

"As I understand it, you desire to have me remit the interest due on the Ellsbury loan to Carver and he will issue a certificate of deposit for it, payable in six months with 6 per cent interest." (Carver was cashier of the Lucca State Bank.)

In March, 1914, Kittel, president, wrote that he had received the abstract; it was all in first-class shape excepting that they neglected to record the deed they got to the land from the Northern Trading Company; that he was asking them to hunt up the original deed and file it for record, so as to complete the title. In May, 1914, plaintiff wrote Kittel, inquiring about the recording of the deed and stating that he presumed that this had been done, but that Kittel had overlooked writing him; that he would feel better satisfied when he knew the title was complete. In June, 1914, Kittel, president, wrote that he issued instructions in connection with this

loan and sent them to Towner to be carried out; "without question those things have been attended to"; "at any rate your mortgage is a valid first lien, but I want the abstract completed and brought down to date, so that I do not have to keep it in mind and so that I will know that everything is closed up." On November 24, 1914, plaintiff wrote Kittel instructing him to collect the first coupon for $140 on the Alfalfa Valley Land Company note, and requesting Kittel to find out definitely whether the deed of the Northern Trading Company to the land company had been recorded, so as to complete the title. Kittel, president, on November 30, 1914, wrote that the interest coupon would be paid "tomorrow promptly"; that he would have the boys mail a draft for it; that the Northern Trading Company, since the floating of the loan, had taken over from the land company all land in Pierce county including the land on which plaintiff had a mortgage; that he had the abstract, but returned it to Towner for completion; that "there will be no trouble whatever with the title." On December 2, 1915, Kittel, president, upon stationery of the Northern Trading Company, wrote plaintiff that they had taken over the land of the Alfalfa Valley Land Company and assumed the payment of his mortgage; that they were just completing an audit and would send to him a check for the amount due plus accrued interest; that "I have disposed of all my banking interests and am devoting myself to this company." On December 20, 1915, the receiver of the defendant bank sent to the plaintiff the $2,000 mortgage note of the Alfalfa Valley Land Company and the mortgage deed.

There is evidence in the record that this land was poor land, practically a sand hill, and worth from $800 to $1,500. The abstract of the land introduced certified by the abstractor in February, 1914, discloses title in the Northern Trading Company and this land company mortgage to the plaintiff, filed January 14, 1914. The abstract as later certified in November, 1916, by the abstractor, shows a judgment of the National City Bank of Chicago against the Northern Trading Company for $15,000, docketed in January, 1916. Under this judgment, upon execution proceedings, this land was sold at sheriff's sale to the National City Bank of Chicago for $1,000 on January 10, 1918. In December, 1916, the plaintiff brought an action against this land company, the Northern Trading Company, and the National City Bank of Chicago to have adjudged the mortgage of the land and to determine the adverse interest of the defendants. The district court determined the judgment lien of the bank to

be a valid prior lien upon the premises. In July, 1917, R. C. Kittel & Co. and as individuals, were adjudicated bankrupts. There is also evidence in the record to the effect that the Alfalfa Valley Land Company and the Northern Trading Company are insolvent. R. C. Kittel was president of the First State Bank of Lucca, vice president and general manager of the Alfalfa Valley Land Company, and vice president of the Northern Trading Company. His brother, W. F. Kittel, was cashier of the defendant bank and secretary of the Northern Trading Company.

In the record there is a real estate loan record of the bank. There are 492 loans in this register aggregating $1,449,500, and covering a period between January 12, 1904, and October 20, 1914. Eight loans, aggregating $30,000, are listed, running to the defendant, as mortgagee. There appear numerous loans wherein R. C. Kittel is mortgagee, and likewise wherein the Northern Trading Company is mortgagee. There appears a loan from the Ellsburys to the Northern Trading Company in 1910, and likewise another loan from the Ellsburys to R. C. Kittel in 1912, both of which were assigned to the Farmers' & Merchants' Savings Bank of Minneapolis. Evidence was introduced to the effect that no commission, exchange, or consideration was ever paid into the bank on either the Ellsbury or the Alfalfa Valley Land Company loan; that receipt of the proceeds of such transactions does not appear on any of the books of the defendant bank. The testimony of the present cashier, Crick, refers to this real estate register as a record of real estate loans made for the convenience of customers. He testified that if the Ellsbury and Alfalfa Valley Land Company loans were handled by the bank they would appear and go through the records of the bank, and if there was anything received on the proceeds of them they would appear on the records of the bank, and if such proceeds were received and they did not appear the books would be out of balance, and that the books of the bank were not out of balance.

In an exhibit introduced it is shown that the assistant secretary of the land company was specifically not authorized by the by-laws to execute notes and mortgages of such company. In the mortgage from such land company to plaintiff, it appears that Mr. Patten, the assistant cashier of the defendant, took the acknowledgment of Thompson, the assistant secretary, who executed such mortgage in behalf of the incorporated land company.

Upon special questions submitted, the jury found that the defendant

agreed with the plaintiff to collect the Ellsbury note and reinvest the proceeds in another good first real estate mortgage; that it had in its possession for safe-keeping and collection this $2,000 Ellsbury note; that the plaintiff sent a release of this Ellsbury mortgage to the defendant bank or its officers for purposes of collecting the Ellsbury mortgage; that the proceeds of this mortgage was paid into the Lucca State Bank and the funds received by the defendant bank; that the defendant on or about January 20, 1914, had under its control or in its possession $2,000, the proceeds of the Ellsbury loan; that the defendant forwarded to the plaintiff on or about January 20, 1914, the Alfalfa Valley Land Company note and mortgage, and represented to the plaintiff that the proceeds of the Ellsbury mortgage was invested in such mortgage and that the title of the lands was in such land company; that it represented that the assistant secretary of this land company was authorized under the by-laws to execute notes and mortgages, and that this mortgage was a first lien upon the land; that he represented that this loan was well secured and that the land was level land, good medium soil, all under cultivation, and well located in a good neighborhood; that it promised to procure and record a deed from the Northern Trading Company to this land company; that in the transactions of collecting the Ellsbury loan and the reinvestment of the proceeds in the land company loan R. C. Kittel was acting as president of the defendant and the plaintiff dealt with him as such; that the representations were made with the intent to deceive the plaintiff and for the purpose of inducing him to accept the land company loan; that the officer making such representations did not believe them to be true and had no reasonable grounds for so believing; that the plaintiff believed and relied upon such representations, and that they were false and untrue; that since January 25, 1916, this land company, the Northern Trading Company, and R. C. Kittel have been insolvent; that plaintiff was damaged in the sum of $2,000, with interest.

### Contentions.

The plaintiff contends that the special findings of the jury are sustained by the evidence; that the transactions involve acts of a bank intra vires; and that, even though the same be ultra vires, the bank may not avail itself of such defense in an action for fraud and deceit.

The defendant attacks the special findings of the jury. The contention

is made that plaintiff's dealings were with Kittel personally; that Kittel was connected with many other concerns and that, most favorably considered, Kittel was the mere agent of the bank; that the transaction involved was not a bank transaction; that it was a mere brokerage transaction in any event; that under the National Banking Act the defendant was prohibited from engaging in such transaction, which the plaintiff, as a matter of law, was bound to know; that there is a total failure of evidence to justify the findings of the jury; that plaintiff turned over to Kittel, as representative of the bank, a satisfaction of the Ellsbury mortgage, and that Kittel, as representative, collected the proceeds thereof and used the same in payment of the land company loan; that the evidence conclusively shows that there is no conversion of plaintiff's security and no tortious act by any agent of the bank while acting within the course of his employment; that, furthermore, there is no evidence to show that the defendant bank had received a dollar of plaintiff's money out of the proceeds of the Ellsbury loan or from the Lucca Bank in connection therewith, or that it made any profit or commission of any kind; that the basis of plaintiff's claim for fraud and deceit is based upon a personal letter of the president of the defendant bank concerning a transaction in which the defendant bank could not engage and involving at best only a mere brokerage transaction for which the defendant bank was not liable for the personal activities of its president Kittel outside of the scope of his employment; that, furthermore, the evidence fails to disclose any receipt of a satisfaction or other paper from the plaintiff, or, upon the books of the bank, receipt of any moneys in connection with the Ellsbury or Alfalfa Valley Land Company, so as to make the transaction of Kittel with the plaintiff a bank transaction.

## Decision.

The facts and contentions of the parties have been set forth somewhat at length in view of the complicated questions involved.

After full consideration of the voluminous record, we are satisfied that the findings of the jury find support in the evidence. The plaintiff did business with the defendant bank before the arrival of R. C. Kittel upon the scene of prominent activities. He was necessarily compelled to do business with the defendant bank after the fall of Mr. Kittel from power. This record undisputably shows that the plaintiff, through a long

course of years, transacted much business with the defendant bank, relying upon the integrity of its officials and the stability of the bank in its transactions as such. The evidence fairly justifies the inferences and findings of the jury that the plaintiff did much of his business with and through Kittel by reason of Kittel's official position with the bank and by reason of the bank, through its activities and its officers permitting, if not directing in some cases, plaintiff's business transactions to be considered and handled through its president, Mr. Kittel. Upon this record the jury were further fully warranted in concluding that the plaintiff understood that he was doing business with the bank in the transaction involved and that he was not aware of Kittel's various activities, personally, in the partnership relation, or in his connections with the corporations of the Northern Trading Company and the Alfalfa Valley Land Company. The defendant denominates as crucial questions: Did plaintiff turn over to Kittel the satisfaction of the Ellsbury mortgage? Did Kittel collect the proceeds of the Ellsbury mortgage and turn such proceeds over to the land company or some third party? Strenuously it contends that the evidence conclusively fails to show that Kittel or the bank so did.

We are of the opinion that the findings of the jury in this regard are sustained in the evidence. The fact of the physical transfer of the satisfaction or of the actual receipt of the proceeds of the Ellsbury mortgage is not, perhaps, shown directly in the evidence, but it is fully shown by indirection through facts that justify such conclusion. In Hamlet it is said, "By indirections find directions out." The defendant bank possessed the Ellsbury note and mortgage upon deposit made of the same by plaintiff. When this loan came due the bank, as directed, forwarded these deposit papers for collection. Kittel drew up a satisfaction of mortgage and he directed its execution by plaintiff and that it be forwarded by plaintiff to the Lucca State Bank. The correspondence between Kittel and the plaintiff fully shows that this Ellsbury mortgage was in fact paid.

When it was paid it is difficult to determine. The loan became due December 1, 1912, yet on November 28, 1913, Kittel advised to the effect that it had not yet been paid, but should be cleaned up. On February 11, 1914, Kittel, in his letter to plaintiff, spoke of remitting the interest due on the Ellsbury loan to Carver of the Lucca State Bank for purpose of having issued a certificate of deposit. Apparently, therefore, between December 1, 1913, and February 11, 1914, on the face of this record, this

Ellsbury loan was paid; apparently, furthermore, Kittel possessed at least the interest due thereon, since he wrote about remitting it to the Lucca State Bank. Who was authorized and entitled upon this record to receive the proceeds of this Ellsbury loan? The answer is that the defendant bank was. The fact that Kittel possessed the interest involved in the proceeds of the Ellsbury loan is indubitable and persuasive evidence that he, as president, also possessed the principal. The correspondence shows that Kittel, as president, was arranging for the purpose of replacing the proceeds of this money in a new loan. Representations were made by him upon various prospective loans. Finally, in advance of plaintiff's consent, the Alfalfa Valley Land Company loan was placed, and the evidence of negotiating such loan was made to plaintiff by sending to him the notes therefor. These at first were found objectionable, but later upon explanation, were accepted by the plaintiff. It seems obvious as a fact that the handling of the notes or mortgage and the satisfaction thereof in the Ellsbury loan were through Kittel, and, further, that Kittel necessarily received the proceeds in the payment thereof. The claim of the bank that this was a personal matter with Kittel and not one with which it was concerned, because the records of the bank show none of these transactions, and that 'they received neither profit nor commission thereon, is negatived by the record facts that for years this bank was concerned with the negotiations of real estate mortgages. Upon the records of the bank, it was concerned at least to the extent of maintaining a loan register, wherein were listed its own loans, and of looking after collections upon interest due on such loans. It knew about the extensive business conducted in the name of its president, Kittel, as mortgagee in many of these loans; it knew to some extent about the business of the Northern Trading Company. It must be evident that the functions of the bank were used, in fact, in connection with this real estate business carried on so extensively for many years. Furthermore, the bank itself, concerning this Alfalfa Valley Land Company, had some knowledge of the transaction, for the reason that there appears, in addition to the fact of the acknowledgements taken by its assistant cashier upon the execution of the mortgage, in the correspondence, a transmittal of the mortgage itself to the plaintiff from the defendant bank through one Knight. We are not convinced that the participation of the bank is made any less evident by the fact that the proceeds of the Ellsbury mortgage when received were not carried through and upon the paper records of the bank by the nota-

tion of the cash receipt of the proceeds and a credit made to the account of Brandenburg or the Alfalfa Valley Land Company. The participation was equivalent, if Kittel, as president, received the proceeds, and, as president, immediately turned them over to the Alfalfa Valley Land Company without any entry upon the records of the bank. The present cashier in his testimony admits that in some cases the performance of an escrow agreement might not show upon the bank books.

The evidence is ample that the plaintiff was deceived and defrauded; he received a pretended mortgage that never was and never has been a mortgage in fact. If Kittel had taken the proceeds of the Ellsbury loan and appropriated the same directly for his own purposes, the plaintiff would not thus have been more defrauded nor more deceived. The evidence warrants the findings that the plaintiff relied on the representations of the defendant's officers concerning the transaction involved, and was defrauded and deceived thereby. It is claimed, however, that this transaction was not a bank transaction; that at most it is simply a brokerage transaction; that the acts of Kittel were beyond the scope of his employment and as far as the bank is concerned are ultra vires; that therefore no liability can be fastened upon the bank. These are the crucial legal questions upon the record and the findings of the jury. It remains for consideration therefore to ascertain to what extent the transactions involved herein are brokerage transactions; to what extent within the lawful power of the bank; to what extent the bank is liable for the ultra vires acts, so far as they obtain, of the defendant's officials.

When the plaintiff sent to the bank the Ellsbury note and mortgage for safe-keeping, care, and collection, the act of the bank in receiving the same and assuming the duty of custody, care, and collection assuredly was acting intra vires. 7 C. J. 630, 817; Morse on Banks and Banking (5th ed.) §§ 191, 192; First Nat. Bk. v. Graham, 100 U. S. 699, 25 L. ed. 750, 36 Am. Rep. 592. When the Ellsbury loan became due and the plaintiff requested that the note and mortgage and the satisfaction in connection therewith be forwarded for collection, again the bank assuredly was acting intra vires. 7 C. J. 816; Morse on Banks and Banking (5th ed.) §§ 52, 208. Upon this record, who was authorized to receive the proceeds of this Ellsbury loan? We are of the opinion that the jury were warranted in finding that the defendant bank was so authorized; that Kittel personally was not so authorized. The defendant contends that the evidence does not disclose that either the bank or Kittel did receive the proceeds of such

Ellsbury loan. We are of the opinion, as heretofore stated, that the jury were warranted in finding that the bank did receive the proceeds of such Ellsbury loan, and that it is not in a position to assert that it did not receive such proceeds when it was authorized so to do and when it was understood from the correspondence had with the plaintiff that it was its duty so to do. Again, in receiving such proceeds of the Ellsbury loan the bank was acting intra vires. Thereupon the plaintiff had the sum of $2,000, concerning which it was the duty of the defendant bank to account to the plaintiff therefor. The interest accrued upon the Ellsbury loan had been paid to the plaintiff by the defendant. Upon representations made by the defendant's president concerning the disposition of this $2,000, the plaintiff, in legal effect, authorized the defendant bank to pay out this money upon a first mortgage lien upon real estate. Again, it may be said that the defendant bank in paying out such money pursuant to plaintiff's legal authorization was acting intra vires. Kennedy v. State Bank, 22 N. D. 69, 132 N. W. 657; Wagner v. First Nat. Bank of Casselton, 173 N. W. 814; First Nat. Bank v. Henry, 159 Ala. 367, 49 South, 97; Emmerling v. First Nat. Bk. of Pembina, N. D., 97 Fed. 739, 38 C. C. A. 399; Citizens' Nat. Bank v. Davisson, 229 U. S. 212, 33 Sup. Ct. 625, 57 L. ed. 1153, Ann. Cas. 1915A, 272. See Minn. Ins. Co. v. Tagus State Bank, 34 N. D. 566, 158 N. W. 1063, L. R. A. 1917A, 519.

Thereupon Kittel, the president through his position as such, fraudulently and deceitfully represented to the plaintiff concerning the prospective first mortgage lien, to be given to the plaintiff for the proceeds of such Ellsbury loan. He may have acted personally for his own benefit or for the benefit of other concerns in which he was interested. He may have deceived the other bank officers and fraudulently imposed upon them. He may have been the person that received whatever benefit would accrue in the transaction from the making of such mortgage. His acts, so far as they made such representations and so far as they may have pretended that the bank was making the loan and was receiving or might receive the benefit therefrom, might have been ultra vires and beyond his authority and beyond the authority of the bank, so far as it concerned the brokerage transaction. The bank, however, still had a duty to perform from its course of conduct with the plaintiff through the years and in connection with the proceeds of this Ellsbury loan. Through its president it appropriated the proceeds of this loan and placed the same in a valueless mortgage, contrary to the legal effect of its instructions and in

violation of its duty. The bank might have refused to have paid out such money upon receiving a first mortgage lien therefor. It might have specifically informed the plaintiff that it would assume no duty nor obligation in connection with the loaning of any moneys of the plaintiff within its control or in its possession. It assumed, however, to perform its duty. Part of this duty was intra vires. The acts of its officer, the president, were ultra vires. Through the bank's permissive acts, its officer's acts were effectuated. The bank adopted such acts in performing its duty. The resulting situation was that the plaintiff was defrauded and deceived. Upon such analysis the conclusion follows that the defendant is not in a position to assert the defense of ultra vires in an action for the fraud and deceit practised, and that, furthermore, in connection with its own acts intra vires and through the fraud and deceit practised, it is liable for the damages that the plaintiff has sustained. The authorities well recognize the principle of law that a bank may not avail itself of the defense of ultra vires when fraud and deceit have been practised, even though it has received no benefit by reason thereof. Smith v. First Nat. Bk. of Casselton (C. C. A.) 268 Fed. 780; First Nat. Bk. v. Henry, supra, 159 Ala. 367, 49 So. 97, 101; First Nat. Bank v. Graham, supra; Stewart v. Wright, 147 Fed. 321, 77 C. C. A. 499; Gilbert v. Citizens' Nat. Bank, 61 Okla. 112, 160 Pac. 635, L. R. A. 1917A, 740, note 749; Anderson v. First Nat. Bank, 5 N. D. 451, 67 N. W. 821; First Nat. Bank v. Anderson, 172 U. S. 573, 19 Sup. Ct. 284, 43 L. ed. 558; Hindman v. First Nat. Bank, 98 Fed. 562, 39 C. C. A. 1, 48 L. R. A. 210; Id., 112 Fed. 931; Zinc Carbonate Co. v. First Nat. Bank, 103 Wis. 125, 79 N. W. 229, 74 Am. St. Rep. 845; Nevada Bank v. Portland Nat. Bank (C. C.) 59 Fed. 338; Morse on Banks and Banking, § 727; 7 C. J. 835.

It is therefore ordered that judgment for the plaintiff be entered, upon the special verdict, pursuant to plaintiff's motion, and that the case be remanded for further proceedings in accordance with this opinion.

CHRISTIANSON and BIRDZELL, JJ., concur.

ROBINSON, C. J., dissents.

GRACE, J. (specially concurring). The plaintiff for many years had transacted business with the bank. He reposed every confidence in it.

He had implicit faith in the integrity of it and its officials. He was transacting business with the bank as such, and not with the officials individually. In the transaction here under consideration he was deceived and defrauded; his money was invested in a worthless security. He was led to do this through the wrongful acts, misrepresentation, and deception of one of the principal officials of the bank. In such circumstances the bank should not be permitted to escape liability.

Though the facts were somewhat different in the case of Keith v. First National Bank, 36 N. D. 315, 162 N. W. 961, L. R. A. 1917E, 901, it was there held, in substance, that, where the officer of a bank transacts business with customers, which business the bank is authorized to do, or which is incidental to its ordinary and regular business, and in the course of the transactions violates the trust relations between the bank and the customer, the bank was liable for any damages thereby suffered by the customer.

The same principle is applicable to the case at bar, and, in reality, is the principle invoked in the main opinion.