HINDMAN v. FIRST NAT. BANK OF LOUISVILLE, KY., et al.

(Circuit Court of Appeals, Sixth Circuit. November 13, 1899.)

No. 650.

1. BANKS—LIABILITY FOR TORTS—FALSE STATEMENTS IN REGARD TO CUSTOMER.
    If a bank, in order to increase its deposits or to sell its collateral, through its board of directors makes or causes to be made false statements concerning the financial condition of one of its customers, to a third person, for the purpose of misleading him, it is liable for deceit if loss results; or if, having made such statements, it conspires with its customer to make the same public, to accomplish the same purpose, it is liable to one who acts upon it to his injury.

2. SAME.
    A petition against a bank and the officers of an insurance company which alleges that the directors of the bank caused its cashier to make a certificate or statement to the insurance commissioner, falsely representing that the company had a certain amount of paid-up capital and surplus, all of which was on deposit in such bank in cash subject to check, when in fact a large part of such capital was represented by notes of the other defendants and other subscribers to the stock, indorsed by the company, of which the bank had made a pretended discount, and to secure which it held the stock as collateral, and that after thus securing from the commissioner a license to do business the bank and the other defendants conspired together, and caused such statement to be published in the newspapers, for the purpose of inducing third persons to purchase the stock so held as collateral, and that plaintiff, being misled thereby, purchased a number of such stock from one of the defendants, the payment for which was received by the bank, and which stock was in fact worthless, because the company did not have the capital represented, states a cause of action against the bank for deceit.

In Error to the Circuit Court of the United States for the District of Kentucky.

This is a writ of error brought to review the judgment of the circuit court of Kentucky sustaining the demurrer to the reformed and amended petition of Thomas C. Hindman against the First National Bank of Louisville and others, seeking to recover damages for loss sustained by the plaintiff in the purchase of 80 shares of the capital stock of the Columbian Fire Insurance Company, which purchase was induced, the petition alleges, by certain fraudulent misrepresentations of the bank and other defendants. The petition originally was ordered by the court to be reformed. A demurrer was filed to the reformed petition, and was sustained. The plaintiff then asked leave to amend, which was granted. The amendment was filed, and a new demurrer filed. This was sustained, and judgment entered for the defendant. (C. C.) 86 Fed. 1013. The reformed petition makes parties defendant the First National Bank of Louisville, C. B. Sullivan, A. W. Hart, and James S. Ray. Ray is made a defendant simply as receiver of the Columbian Insurance Company, and not as a party to the transactions charged against the other defendants. The petition,

after setting up the necessary jurisdictional facts as to the diverse citizenship of the plaintiff and defendants, avers that in January, 1893, certain persons duly organized the Columbian Fire Insurance Company under the laws of Kentucky, and applied to the insurance commissioner of that state to do business as such therein, with a capital of $200,000 and a surplus of $50,000; that the commissioner entered upon an investigation of the affairs of the company; that the incorporators falsely represented that the capital had been paid in full, and that in addition the company had $48,000 surplus in cash, free from debts and liabilities, and that the whole sum of $248,182.90 was on deposit in the First National Bank of Louisville, and subject to check; that the commissioner applied to the bank for confirmation of this statement; that the board of directors of the bank, knowing the object of the inquiry, caused the bank cashier to make a sworn certificate to the insurance commissioner that the insurance company had on deposit $248,000 of capital paid in and net surplus; that the statement was untrue, and was made for the fraudulent purpose of enabling the insurance company to deceive the commissioner and secure a license to do business, when it was not lawfully entitled to one; that it was done in pursuance of a conspiracy between the bank and the officers of the insurance company, C. B. Sullivan, A. W. Hart, and others; that, to give the false appearance of such a deposit as was certified, the insurance company and the bank pretended to make certain discounts of promissory notes of notoriously insolvent persons, each of which had been given, as the bank knew, in payment of the maker's subscription to the stock of the insurance company; that the bank had gone through the form of discounting the notes on the indorsement or guaranty of the insurance company, and of placing the proceeds to the credit of the latter on the bank's books; that many of the said notes were not discounted in good faith; that the proceeds thereof were never intended to be, and were never in fact, subject to checks of the insurance company, and the bank had at all times retained a lien on the fund thus apparently standing to the credit of the insurance company. The petition proceeds:

"Plaintiff says that the said First National Bank united with said insurance company and other named defendants, except Ray, in this said fraud, for the purpose of obtaining the benefit that would result to it from having said insurance company keep a large deposit with said bank; it having been previously agreed and understood between said bank and said insurance company that the latter would, if licensed to do business, keep a large amount of cash on deposit with said bank at all times. Plaintiff says that in compliance with this agreement said insurance company did thereafter at all times during its existence keep a large amount of cash on deposit in said bank, which deposit was of great value and benefit to said bank. Plaintiff says that said insurance company, having, in the fraudulent manner herein recited, obtained license to do business in Kentucky and in other states, commenced at once to engage in the fire insurance business throughout the various states in which it was licensed. Plaintiff says that said defendants, except Ray, further represented to the plaintiff and to the public, by publications, that the said company had said cash capital and surplus amounting to $248,182.90, which publications were made in the public prints and scattered over the country, and which were seen and relied upon by plaintiff, and falsely represented that there were no mortgages upon the same or liens upon the same, and that the stock had been paid for at $125 a share, and that the company was organized and ready for business, and made representations to the effect that the said company was a bona fide company, with a sound capital, properly organized; and plaintiff alleges that all the parties named in the caption hereof co-operated with said insurance company and said bank and the officers thereof, and the other defendants, except Ray, in setting said company on foot, and publishing that said cash capital and surplus of $250,000 had been paid up in cash, bona fide, in accordance with said representation. * * * And this plaintiff alleges that by the representations and publications of the defendants, and by the issual of the said statement by said bank to the said Duncan, and the licensing of said company by said Duncan, insurance commissioner, he was deceived, * * * and while deceived by the false representations and deceit and false and fraudulent conspiracy of said defendants in setting on foot and floating said company, and while ignorant of the fraud practiced upon him and the public, and when he

believed the representations and publications aforesaid to be true, and the false and fraudulent insurance company to be a bona fide and genuine insurance company, properly licensed, purchased on February 6, 1893, eighty shares of the capital stock of the said Columbian Fire Insurance Company of America at the price of $125 a share, making a total of $10,000, * * * all of which said shares were paid for in cash by said plaintiff, and were issued to him on the 6th day of February, 1893.

"Plaintiff says that it was the purpose of all the said defendants, except Ray, to put stock of said insurance company on the market to be sold, to make up said capital stock, which was short, as hereinbefore alleged, and that the defendants A. W. Hart and C. B. Sullivan, representing themselves and the said other defendants, and acting in collusion with all the other defendants, except Ray, represented to the plaintiff that the said stock thus sold to him had been paid for, bona fide, in cash by the original subscriber therefor, which representation was false, and known to them and the other defendants to be false, and that said original certificates would be taken up, and new certificates issued in lieu thereof to the plaintiff; and plaintiff alleges that, as a matter of fact, the shares of stock which were so canceled, and in place of which the certificates filed herewith were issued to him, were shares of stock which had been originally issued to C. B. Sullivan, and for which he had subscribed and not paid, and which had never been paid for by him or any person whomsoever; and alleges that said stock which was thus sold to him was a part of the stock used as collateral in the pretended discounting of notes, by which, on the guaranty or indorsement of the insurance company, money was placed to the credit of said insurance company, to make up the fictitious capital thereof, by the First National Bank, and said bank participated in said frauds, and got the benefit of said payment made by said plaintiff for his stock. All of the defendants, except Ray, knew of the shortage in said capital stock, and fraudulently conspired and contrived the setting on foot of the said insurance company, and the selling of said stock to this plaintiff; and plaintiff alleges that said stock, at the time of the sale to him, and at all times during the existence of the company, was absolutely worthless, and known to be so by all said defendants, who knew that said company started in said fraudulent manner, and was unsound. Plaintiff alleges that said company continued in business as a fire insurance company for about fourteen months, but by reason of its not having its capital stock as aforesaid, and of the aforesaid shortage in its capital stock, it was forced to make an assignment on February 27, 1894, and did so assign, and became and was at all times from its inception insolvent, and the stock was and is absolutely worthless."

By amendment to the petition, plaintiff further averred as follows:

"Plaintiff alleges that it was a part of the plan and design of said defendants, among whom was said bank, to have said stock put in the name of parties who did not intend in good faith to take the same, and this was the case with the said stock of C. B. Sullivan, which was sold to plaintiff; and the purpose of so doing was to put off upon plaintiff and sell to him the stock in the said fraudulent insurance company, the said Hindman, plaintiff, to pay cash therefor, and under said plan the said plaintiff was in reality the first allottee of said stock; the said C. B. Sullivan, as plaintiff alleges, being in league with and co-operating with the said bank and other defendants to so sell stock which he had never intended to pay for himself, and to put on foot said insurance company without the alleged capital and surplus, and without the capital paid in as required by law, and knowing that the same had not been paid in. Wherefore plaintiff prays as heretofore, and for all proper relief."

Judge BARR, who presided in the circuit court, sustained the demurrer on the ground that the misrepresentations set forth were addressed to the original allottees of the stock, and not to the plaintiff, who was a purchaser from an original allottee; following in this the authority of the case of Peek v. Gurney, L. R. 6 H. L. 378.

W. W. Thum, for plaintiff in error.

A. P. Humphrey, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). The so-called reformed petition and its amendment are inartificially drawn, and are full of redundancy and evidential averments, but we think that they state with sufficient clearness the following case: Several of the defendants other than the bank organized a fire insurance company under the laws of Kentucky. Before the company could do business under the laws of Kentucky, it was necessary for it to procure a license from the state insurance commissioner. The license could only issue upon proof that the capital ($200,000) of the insurance company had been paid in in cash. But a little over $100,000 of the capital had been paid in cash and deposited in the defendant bank. To make up the needed remainder, the defendant bank accepted notes of various subscribers to the stock for the amount of their respective subscriptions, with the stock pledged as collateral therefor. The notes were indorsed by the insurance company. Though the proceeds of the notes were credited to the latter on the books of the bank, the amount of them was not, according to the understanding between the bank and the insurance company, subject to check. In order to start the insurance company in business, and thereby secure for itself a large deposit account, and for the further purpose of selling the stock of the insurance company pledged to it as collateral, the defendant bank, through its board of directors, assisted the insurance company to obtain a license by directing its cashier to certify to the insurance commissioner that the insurance company had on deposit with it, subject to check, $200,000 paid-up capital and $48,000 net surplus. The license was issued upon the faith of this certificate. In further pursuance of its purposes the defendant bank united with the other defendants in procuring the publication in newspapers of general circulation in Kentucky and elsewhere of statements similar to those contained in the cashier's affidavit. The plaintiff, induced by such publications and by the statements in the cashier's affidavit, and relying thereon, bought 80 shares of the stock of the insurance company, which the bank then held as collateral security for a note of one of the defendants given for his stock subscription. Plaintiff paid $10,000 for the stock. The stock was worthless when he bought it, and has never been worth anything since. The insurance company, owing to the fact that it never had the amount of capital required by law, became wholly insolvent, and was wound up under the laws of Kentucky. The statement of the cashier was plainly false, and known to be so by the bank, for it clearly implied that the capital and surplus were in cash over and above all liabilities.

The argument of counsel for the defendant in error is: First. That the statement of the cashier, in so far as it certified that the insurance company's deposit was for capital and net surplus, was ultra vires, and could not be made ground for holding the bank for deceit. Second. It is contended that neither the cashier's affidavit

nor the newspaper publications were addressed to the plaintiff, and he had no right to rely on them; that the former was directed to the insurance commissioner only, and the latter to the possible subscribers to the stock, and not to one who, like the plaintiff, bought stock already issued.

First, it is to be observed that the question here is not of the authority of the cashier, as was the case in First Nat. Bank v. Marshall & Ilsley Bank, 54 U. S. App. 510, 28 C. C. A. 42, 83 Fed. 725. The petition specifically avers that the certificate was made by order of the board of directors. This was the governing body of the bank, and although, of course, in a certain sense, it is an agency or representative of the bank, it is for all practical purposes the bank. Goodspeed v. Bank, 22 Conn. 530, 540, 541; Burrill v. Bank, 2 Metc. (Mass.) 163; Bank Com'rs v. Bank of Buffalo, 6 Paige, 502; Pollard v. Vinton, 105 U. S. 7, 12, 26 L. Ed. 998; Railway Co. v. Prentice, 147 U. S. 101, 114, 13 Sup. Ct. 261, 37 L. Ed. 97; Railway Co. v. Harris, 122 U. S. 597, 610, 7 Sup. Ct. 1286, 30 L. Ed. 1146. The question here, therefore, is whether a national bank can make itself liable in an action for deceit by causing a knowingly false statement to be made concerning the financial condition of one of its customers. In England it is said that a corporation may be held liable for the commission of any wrongful act within the scope of its incorporation. Green v. Omnibus Co., 7 C. B. (N. S.) 290; Edwards v. Railway Co., 6 Q. B. Div. 287; Clerk & L. Torts, 49. By this is meant, not that the charter must specifically authorize the wrongful act, but only that it must be committed by the corporation in pursuance of a power lawfully conferred, though wrongfully and tortiously exercised. The same view is taken by Mr. Justice Campbell, speaking for the supreme court of the United States, in Railway Co. v. Quigley, 21 How. 202, 16 L. Ed. 73, as follows:

"The result of the case is that for acts done by the agents of a corporation, either in contractu or in delicto, in the course of its business and of their employment, the corporation is responsible, as an individual is responsible under similar circumstances."

The limits of a corporation's liability for a wrong are somewhat less strictly laid down in later cases in our supreme court. In Bank v. Graham, 100 U. S. 699, 702, 25 L. Ed. 750, Mr. Justice Swayne, speaking for the supreme court, said:

"Corporations are liable for every wrong they commit, and in such cases the doctrine of ultra vires has no application." "An action may be maintained against a corporation for its malicious or negligent torts, however foreign they may be to the object of its creation, or beyond its granted powers. It may be sued for assault and battery, for fraud and deceit, for false imprisonment, for malicious prosecution, for nuisance, and for libel."

In Salt Lake City v. Hollister, 118 U. S. 256, 260, 6 Sup. Ct. 1055, 30 L. Ed. 176, Mr. Justice Miller, speaking for the court, said:

"The truth is that with the great increase in corporations in very recent times, and in their extension to nearly all the business transactions of life, it has been found necessary to hold them responsible for acts not strictly within their corporate powers, but done in their corporate name, and by corporation officers who were competent to exercise all the corporate powers. When

such acts are not founded on contract, but are arbitrary exercises of power, in the nature of torts, or are quasi criminal, the corporation may be held to a pecuniary responsibility for them to the party injured."

The latest expression of the court on this subject is found in Gaslight Co. v. Lansden, 172 U. S. 534, 544, 19 Sup. Ct. 296, 43 L. Ed. 543, in which it is said:

"The result of the authorities is, as we think, that, in order to hold a corporation liable for the torts of any of its agents. the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal. The corporation can be held responsible for acts which are not strictly within the corporate powers, but which were assumed to be performed for the corporation and by the corporate agents who were competent to employ the corporate powers actually exercised."

It is not necessary for us to consider or discuss the difference, if any, between these measures of corporate liability for torts, because we think that the case made by the petition is within the most conservative of them. It is a part of a bank's business to secure as large deposits as possible. It is also part of a bank's business to sell at as high a price as may be the collateral held by it to secure its bills receivable. If the bank, in order to increase its deposits or to sell its collateral, makes or causes to be made false statements concerning the financial condition of one of its customers and depositors to a third person, for the purpose of misleading that person to his injury, we think the bank is liable in deceit if loss ensues. The relation of a bank to its depositors and customers is one which gives it exceptional opportunity to acquire most reliable information of their business and financial affairs. It is a common practice for the cashier of one bank to apply to the cashier of another to learn the financial standing of customers of the latter bank, or, indeed, of any person doing business in the city of the latter bank. When the answers made are not made for the benefit or in the business of the second bank, but are merely matters of courtesy between the two cashiers, the second bank is not responsible for their inaccuracy or falsity. This was found to be the state of the case in First Nat. Bank v. Marshall & Ilsley Bank, 54 U. S. App. 510, 28 C. C. A. 42, 83 Fed. 725. But the ratio decidendi of that case was that if the false answer to the query had been made by the cashier, with the privity of the president, in the business and for the benefit of the bank, the bank would have been liable. It is the usual practice for depositors and customers of a bank to refer others to the bank for information as to their financial responsibility. To give such information to third persons or to the public at the instance of the customer or depositor is certainly not beyond the scope of banking powers. It is argued that, while the bank might properly certify to the amount on deposit to the credit of one of its depositors, it has no power to certify how much of the deposit is for capital and how much for net surplus. This is too refined. The bank's relation to the insurance company as a customer might very well enable it to learn with reasonable certainty how and for what purpose the money deposited had been paid in, and whether it was net capital or surplus, or was likely to be reduced by outstand-

ing liabilities, and to give this information to whom it might concern, with the consent of the depositor. It certainly had the amplest knowledge of the fact that the insurance company was a large debtor of the bank,—so large as to make the statement that it had a paid-in cash capital and net surplus of $248,000 utterly false. If it made such a statement to the insurance commissioner to obtain a license, and was privy to the publication of the same statement in the public press, as is alleged, all for the purpose of securing a large bank deposit and of selling stock held by it as collateral, it seems to us that this was done in the course of the business of the bank, and was "within the scope of its incorporation." In Barwick v. Bank, L. R. 2 Exch. 259, the action was for deceit against a bank. The plaintiff furnished feed to the horses of a government contractor, who was a customer and depositor of the bank, on the written assurance of the manager of the bank that if the plaintiff would do so the bank would pay him out of the first money received by the contractor from the government after the bank had satisfied any claim of its own. The bank then held a note of the contractor for £12,000, but the manager did not disclose this. The court held that the case should be left to the jury to say whether the manager had not given the plaintiff to understand that there was a probability that out of the government payment there would be enough to pay plaintiff, when he knew there was not. This case shows clearly that a bank's statement concerning the financial condition of its customer is an act within its corporate capacity, at least when made to further the business interests of the bank. The petition charges the bank not only with falsely making the false statement to the insurance commissioner, but also with conspiring with the other defendants to repeat the statements to the public in the newspapers in furtherance of the two purposes already stated. It is now well settled that a corporation may be held for torts in which express malice or intent to defraud is a necessary element. Barwick v. Bank, L. R. 2 Exch. 259; Goodspeed v. Bank, 22 Conn. 530; Railway Co. v. Quigley, 21 How. 202, 16 L. Ed. 73; Railway Co. v. Prentice, 147 U. S. 101, 114, 13 Sup. Ct. 261, 37 L. Ed. 97; Railway Co. v. Harris, 122 U. S. 597, 610, 7 Sup. Ct. 1286, 30 L. Ed. 1146. It is a necessary corollary from these cases that a corporation may be held for a conspiracy with others resulting in injury to a third person. The point is expressly adjudged by the court of appeals of New York in Buffalo Lubricating Oil Co. v. Standard Oil Co., 106 N. Y. 669, 12 N. E. 825; same case in supreme court, 42 Hun, 153. See, also, to same effect, Moores v. Bricklayers' Union, 23 Cin. Law Bul. 48, affirmed by supreme court of Ohio, without report, 31 Cin. Law Bul. 208; Dodge v. Bradstreet Co., 59 How. Prac. 104. If a bank may make a false statement concerning the financial condition of one of its customers for its own benefit, and may conspire with another to accomplish its business purposes, it follows that it may conspire with others to circulate the statement already made by it to deceive the public, and that any one of the public to whom the statement is addressed, and who acts upon it to his injury, may hold the bank for his loss.

The second ground urged in favor of the demurrer was that the statements concerning the financial condition of the insurance company were not addressed to the plaintiff, but only to the insurance commissioner, on the one hand, or to the probable subscribers to the stock of the insurance company, on the other. The plaintiff, it is said, was not the insurance commissioner, and was not a subscriber to the stock, but was a purchaser from an original subscriber. In the case of Peek v. Gurney, L. R. 6 H. L. 377, one who, misled by false statements in a prospectus issued by the directors of an intended company, had bought shares therein from an original allottee and suffered severe losses, attempted to hold the directors for his injury. It was held that a prospectus was addressed to the original allottees; that when the allotment was completed the office of the prospectus was exhausted, and one purchasing from an original allottee could not rely on it and hold those issuing it for his loss. The case has not met with entire concurrence by the courts of this country. Dissent from its conclusion is based on the view that one issuing a prospectus or statement calculated to mislead others to their injury ought to be charged with liability to any person or class of persons whose action on the faith of it he might reasonably anticipate, and that purchasers from original allottees are quite as likely to act on the prospectus as the allottees themselves. We do not find it necessary, however, to discuss the principles of Peek v. Gurney in deciding this case, for we think it clear that the averments of the petition make it unnecessary. The newspaper statements of the condition of the insurance company, repeated from the cashier's statement to the insurance commissioner, to all of which the bank is alleged to have been privy, were not issued or addressed to original subscribers to the stock. The petition and its amendment in effect aver that the original subscriptions were made by defendants and others engaged in promoting the company, and that the purpose of the company and the bank was not so much to secure original subscribers, as to sell the stock which had been pledged to the bank to secure payment of the original subscriptions, and which the bank was therefore especially interested in selling. The false statements are thus averred to have been made for the very purpose of reaching and influencing purchasers like the plaintiff, and Peek v. Gurney has no application. See Andrews v. Mockford [1896] 1 Q. B. 372. Even if it be conceded that the plaintiff had no right to rely on the certificate to the insurance commissioner, the repetition of the contents of the certificate in newspaper publications by the bank and others for the very purpose of misleading probable purchasers of the stock is quite sufficient to hold the bank and the other defendants.

A third objection to the sufficiency of the petition and its amendment is that it shows no damage to plaintiff, and fraud without damage gives no action. The contention is that the measure of the recovery in such a case is the difference between the price paid and the value of the stock when bought (Peek v. Derry, 37 Ch. Div. 591), and that there is no averment in the petition that the stock was not worth what plaintiff paid for it when he bought it. For subsequent losses due to misfortune or mismanagement defendants can-

not, it is said, be made responsible in this action. This objection must fail for the reason that the petition expressly alleges that the stock was worthless when plaintiff bought it. The judgment of the circuit court is reversed, with directions to overrule the demurrer to the reformed petition and its amendment, and to require the defendants to answer. The costs of the proceeding in error should be paid by defendants.