**TEXAS TUNNELING COMPANY**

v.

**CITY OF CHATTANOOGA, TENNESSEE; Lewis A. Schmidt d/b/a Schmidt Engineering Company, and William A. Havens, Alfred W. Burger, Harry H. Moseley, Jasper W. Avery, Frank S. Palocsay and Edward S. Ordway d/b/a Havens and Emerson.**

**Civ. A. No. 3215.**

United States District Court
E. D. Tennessee, S. D.
March 23, 1962.

Robert L. McMurray, Donald L. Halladay, Noone, Moseley & Noone, Chattanooga, Tenn., for plaintiff.

Will Allen Wilkerson, Wilkerson & Abshire, Chattanooga, Tenn., for defendant Havens & Emerson.

Ellis K. Meacham, Chattanooga, Tenn., for defendant City of Chattanooga, Tenn.

FRANK W. WILSON, District Judge.

In this suit the plaintiff, Texas Tunneling Company, seeks to recover damages it claims to have sustained as a result of alleged misrepresentations upon the part of the defendants. More specifically, the plaintiff contends it was caused to sustain heavy losses in digging a tunnel at Chattanooga, Tennessee by the defendants having wrongfully omitted, withheld and misrepresented geological information.

The following matters, which are not in dispute, constitute a narration of the background and events leading up to this lawsuit.

For a number of years the City of Chattanooga has had under design and construction an interceptor sewer system for the City. Upon March 18, 1952 the City entered into a contract with Havens

and Emerson for engineering services upon this project. Havens and Emerson is a partnership composed of five partners, engaged in business as consulting engineers, and maintaining offices in Cleveland, Ohio and New York City. Under the terms of their contract with the City, Havens and Emerson did certain design and engineering work upon the interceptor sewer system, including the designing of a tunnel leading through a hill known as Stringers Ridge. The tunnel was designated as Stringers Ridge Sewer Tunnel, was approximately 976 feet long and was designed to have an outside diameter of nine feet.

During the same period that Havens and Emerson were employed as consulting engineers, the City also employed Lewis A. Schmidt, an individual operating a resident engineering firm under the name of Schmidt Engineering Company, to perform certain engineering services. These services, insofar as they pertain to the sewer tunnel and are material to this lawsuit, were limited primarily to inspection services.

For a period of time during 1955 the City likewise employed the firm of Law-Barrow-Agee, of Atlanta, Georgia, to perform certain test bore drilling in connection with the design and location of a portion of the interceptor sewer system, including the Stringers Ridge Tunnel area. A number of test bores were drilled by the Law-Barrow-Agee firm, including five test bores in the area of the Stringers Ridge Tunnel, these holes being bored at intervals of 200 feet and varying in depth from 38 feet near the base of the Ridge to 168.5 feet near the crest of the Ridge. The results of this work were filed with the City by Law-Barrow-Agee in the form of a "Test Boring Record," which is Exhibit No. 6 in the trial record. This report, among other matters, purports to set out in diagrammatic, numerical and descriptive form the materials encountered and the percentage of core recovery made at all depths in each test bore. There was also filed with the City the "Test Boring Field Report," which is

Exhibit No. 5 in the trial record, this being a compilation of the drillers' daily field notes. In the course of the drilling certain core recoveries were made, and these too were turned over to the City after labeling and identification.

Copies of both the Test Boring Record (Exhibit No. 6) and the Daily Test Boring Field Report (Exhibit No. 5) of Law-Barrow-Agee were turned over by the City to Havens and Emerson and were presumably used by them in their engineering and design work for the City. At any rate, as a part of this work, Havens and Emerson prepared a diagrammatic drawing of the results of the test borings, designating this drawing as "Stringers Ridge Sewer Tunnel Boring Logs" and being further identified as Drawing No. 456–11–2. This drawing is Exhibit No. 4 in the trial record. It was prepared from the Law-Barrow-Agee Test Boring Record (Exhibit No. 6), and purports to set forth in graphic, descriptive and numerical form the information contained in that report. With regard to two of the test bores in the central part of the tunnel area, designated in the record as Test Bores 31 and 32, the Havens and Emerson Boring Log Drawing (Exhibit No. 4) omitted information as to the percentage of core recovery in and near the tunnel level, although this information was shown upon the Law-Barrow-Agee Test Boring Record (Exhibit No. 6). It is this omission that forms one of the principal issues in the lawsuit.

Pursuing further the history and background of this lawsuit, in the latter part of 1955 the City solicited bids upon a portion of the interceptor sewer system, including the Stringers Ridge Tunnel. For this purpose the City distributed to prospective bidders plans and specifications, the proposed contract, and a copy of the Havens and Emerson Boring Log Drawing (Exhibit No. 4). These bids were opened upon January 10, 1956. The bids ranged from a low bid by Stein Construction Company of $270,395, including the tunnel portion bid at $234,240, to a high bid of $418,118, including

the tunnel portion bid at $377,712. The contract was awarded to the low bidder, Stein Construction Company, and was executed under date of January 24, 1956. Around this same date, officials of the Texas Tunneling Company, the plaintiff herein, first came to Chattanooga and undertook negotiations with Stein Construction Company for the purpose of subcontracting the digging of the tunnel. Stein Construction Company furnished the plaintiff with the plans and specifications, the contract with the City, and a copy of the Havens and Emerson Boring Log Drawing (Exhibit No. 4). The plaintiff negotiated a subcontract with Stein Construction Company to dig the 976 foot Stringers Ridge Sewer Tunnel at $109 per foot, or for a total subcontract price of $106,384. This subcontract was executed upon January 27, 1956. The plaintiff began digging the tunnel in March of 1956 and this work was completed in November of the same year. This forms the background to this suit.

Turning now to the plaintiff's complaint, the plaintiff contends that it was caused to sustain a heavy loss in performing the subcontract by reason of having underestimated the job, having estimated the job could be completed in 18 weeks, whereas because of the materials encountered it took 34 weeks to do the work. The plaintiff contends that it was misled by the defendants as to the geological formations to be encountered in digging the tunnel, resulting in its having underbid the job and thereby sustaining the loss conplained of. More specifically the plaintiff contends that the City of Chattanooga, Havens and Emerson and Schmidt Engineering Company, individually and working together, made the following misrepresentations which caused the plaintiff to underbid the job and sustain its loss:

(1) They omitted or caused to be omitted from the Boring Log Drawing (Exhibit No. 4) the fact that diamond core drilling was performed on Test Bores 31 and 32 at or near the tunnel level, these test bores being in the central portion of the tunnel.

(2) They omitted or caused to be omitted from the Boring Log Drawing (Exhibit No. 4) the percentage of core recovery made in Test Bores 31 and 32 at or near the tunnel level.

(3) They negligently omitted or concealed the fact that core boring samples were retained and subject to inspection.

(4) They omitted or caused to be omitted information from the Law-Barrow-Agee Test Boring Field Reports (Exhibit No. 5) that showed materials to be encountered in digging the tunnel at Test Bores 31 and 32 substantially different from that shown upon the Boring Log Drawing (Exhibit No. 4) furnished the plaintiff.

In its answer the City contended that it had no privity or dealings with the plaintiff, who was a subcontractor, that it was not a party to any misrepresentations, that the contract and drawing specifically provided that the City did not warrant the geological information, and in fact that the drawing was expressly excluded as being any part of the contract, and finally that it did not conceal from the plaintiff the fact that it held core boring samples. Similar defenses were asserted by the defendants, Havens and Emerson. In addition Havens and Emerson admitted that the percentage of core recovery was omitted from their drawing (Exhibit No. 4) but averred that this was an unintentional oversight and that the omission of this information was not material, that the plaintiff was not misled by the omission, but rather that the materials actually encountered by the plaintiff were those as shown upon the drawing. Havens and Emerson denied that they had anything to do with the core samples or were in any way responsible therefor.

A somewhat similar answer was filed by the defendant, Lewis A. Schmidt, but it will not be necessary to go into this as, at the time of the trial, the Court entered a judgment of dismissal as to this defendant at the conclusion of the plaintiff's evidence. The Court was of the opinion that there was no evidence

that Mr. Schmidt knew of or was in any way responsible for the alleged omissions and misrepresentations complained of by the plaintiff. Likewise a third-party action by the City against Stein Construction Company has heretofore been dismissed upon a motion for summary judgment.

Likewise for reasons set forth in a former opinion, this case will be dismissed as to the defendant, the City of Chattanooga, and will remain for consideration as to the defendants, Havens and Emerson, and with regard to these defendants only as to the second alleged misrepresentation wherein the plaintiff contends that the defendants wrongfully and tortiously omitted from the Boring Log Drawing (Exhibit No. 4) the percentage of core recovery made in Test Bores 31 and 32 at or near the tunnel level. The facts in this regard are rather clear. It was admitted by the defendants, Havens and Emerson, that this information was contained in the Law-Barrow-Agee Test Boring Record (Exhibit No. 6) but was omitted from their drawing (Exhibit No. 4), and that this was a drafting error. However, it is contended by these defendants that this omission was an unintentional omission or drafting oversight. The Court is of the opinion that the record sustains the defendants' contention in this regard, namely that the omission was not an intentional omission upon their part. In this regard it is the position of the defendants that to constitute an actionable tort, their actions must have amounted to an intentional or fraudulent act to deceive or mislead the plaintiff. In support of their position that a tort action for deceit will lie only for a fraudulent or intentional act or omission, the defendants cite authority, including the following language from 23 Am.Jur., Fraud and Deceit, Sec. 116:

"In a great majority of American jurisdictions and in English courts, the rule is firmly established that the existence of a fraudulent intent or an intent to deceive is an indispensable element to successful maintenance of a tort action of deceit for the recovery of damages."

Upon the other hand, it is contended by the plaintiff that a tort action for deceit will lie for a misrepresentation or omission made recklessly, careless as to its truth or falsity, and that while the record may not establish that the defendants, Havens and Emerson, intentionally omitted the percentage of core recovery information, this omission was made recklessly, careless as to its accuracy. In support of its contention in this regard the plaintiff cites authority, including the following language from the case of Shwab v. Walters, 147 Tenn. 638 at 644, 251 S.W. 42 at 44:

"To justify the recovery in this case it is not necessary that Walters should have absolutely known that the statement of liabilities compiled by the auditors and approved by him was false. If he approved this statement without belief in its truth or recklessly, careless whether it be true or false, the result would be the same."

If by the phrase "recklessly, careless whether it be true or false" is meant a willful or wanton act upon the part of the defendants, Havens and Emerson, the Court is of the opinion that the record in this case does not sustain a finding that the said defendants omitted the percentage of core recovery information from Exhibit No. 4 intentionally or recklessly, in the sense of willfully or wantonly, so as to constitute a fraudulent misrepresentation upon their part. On the contrary, the only conclusion the Court can draw from the record in this case is that by oversight or at most simple and unintentional carelessness, one of the defendants' draftsmen, who was never identified, failed to include the percentage of core recovery on Exhibit No. 4, although this information was contained in the Law-Barrow-Agee Test Boring Record, Exhibit No. 6, from which he obtained his information. Likewise, by unintentional oversight this omission was not noticed by other members of the defendants' firm, and the drawing was

delivered to the City with this information omitted. The defendants had no knowledge of this omission until it was called to their attention by the filing of this lawsuit long after the alleged loss by the plaintiff. If this action is based upon a fraudulent or intentional tort, it is the opinion of the Court that it should be dismissed.

Upon the other hand, if the plaintiff contends that the defendants were guilty of a negligent omission and that the phrase "recklessly, careless whether it was true or false" encompasses a negligent tort, the question remains as to whether a tort action of deceit will lie for a negligent misrepresentation.

■ Before turning attention to this rather involved and difficult question, as a preliminary matter it is proper to consider the conflict of laws question as to what law is to be applied. It does not clearly appear in the record where Exhibit No. 4 was drawn, whether at the defendants' offices in Cleveland, Ohio, in New York City or elsewhere. In any event, however, no negligent misrepresentation could be complete until the drawing was delivered and this act was done in Tennessee. The Court will therefore look to the law of Tennessee.

■ With regard to the question of actionability of negligent misrepresentations, the actual state of the law is difficult to determine. In Derry v. Peek, 14 App.Cas. 337, 58 L.J.Ch. 864, the case most widely cited and quoted from in this field, the following statements were made:

"First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will ·suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, or (2) without belief in in its truth, or (3) recklessly, careless whether it be true or false."

Upon the authority of this language the rule has usually been assumed to be that the action of deceit is an action for fraudulent—i. e., knowing and intentional—misrepresentation only, and not for merely negligent misrepresentation. 23 Am.Jur., Fraud and Deceit, Sec. 126.

It is to be observed, however, that the language of Derry v. Peek, is something less than unequivocal support for the flat statement that negligent misrepresentation is not actionable, aside from the fact that that language was under the facts of the case dictum.

In the first place, there is a distinction between a misrepresentation made "recklessly, careless whether it be true or false" and a misrepresentation made fraudulently, with knowledge of its falsity and with deliberate intent to mislead. Recognition of liability for the former may not constitute recognition of liability for negligent misrepresentation, but it is a step in that direction and a step away from the rule that only fraudulent misrepresentation is actionable. Failure to observe this distinction has led to some ambiguity in the law of deceit. Thus in Shwab v. Walters, 147 Tenn. 638, 251 S.W. 42, the Tennessee Supreme Court said one thing but did another when it stated first that in "An action for fraud and deceit * * * the plaintiff must prove * * * that the representation was false *and the person making it knew it to be false* * * *." (Emphasis added), and then proceeded upon the next page to hold that a misrepresentation made "recklessly, careless whether it be true or false" was sufficient to support the action of deceit in that case.

The second. point which makes Derry v. Peek dubious authority for a rule that negligent misrepresentations are never actionable arises from its statement that "First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice." This sentence does not say that fraud must actually be established, but merely that "there must be proof of fraud" without specifying the degree of proof which is to be required. This omission has made it possible for courts unsatisfied with the rule requiring fraud to give lip service to the rule even as they make substan-

tial departures from it by lowering their requirements as to the degree or quality and quantum of proof necessary to establish fraud. Shwab v. Walters is one instance of this practice. Another more noted instance is found in the case of Ultramares Corporation v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139, involving a misrepresentation made indirectly through an intermediary, where the Court denied recovery upon a count for negligent misrepresentation, but held that the negligence proved would permit an inference of fraud by the trier of fact, and hence would support a count for fraudulent misrepresentation, without violating the rule that only fraud will support the action of deceit. And these are not the only cases hallowing the ostensible rule while revising its substance. Thus it is stated in 23 Am.Jur., Fraud and Deceit, Sec. 127, that

"It is very generally held that scienter may be proved by showing that the special situation or means of knowledge of the party making the representations are such as to make it his duty to know whether they are true or false. In so far as the element of knowledge is concerned, false representations may be ground for relief where the party making them ought to know, or it is his duty to know, or he has the means of knowing, the truth. For instance, one may be held liable for a false representation where the facts are peculiarly within his own knowledge, where it lies within his special province to know them, or where the other party has a right to suppose that he has used reasonable diligence to inform himself of the truth. The rule applies even though the party making the statements does not know that they are false, but actually believes them to be true, and has no intention to deceive or defraud the other party.

"Various reasons are announced as the basis of the rule underlying the duty to know facts represented and the liability for falsity of such facts. The representor ought to know, it is declared, not because he ought not to speak negligently, but because, under circumstances involving application of the principle, where representations are made of material facts, he ought not to speak of the facts at all for the purpose of inducing the representee to act in dependence on the truthfulness of what is spoken, unless he knows that his representations are true or expects to assume the burden of a warrantor of their truthfulness. Under such circumstances, the law imputes knowledge of the truth to him, and therefore, in contemplation of law, he knows that his statement is false, and hence it is fraudulent. Another reason given for the rule is that the representation, although made by mistake or ignorance, operates as an imposition upon the other party, and the person making it, as against an innocent man who has suffered by reason thereof, will not be allowed to say he made it honestly believing it to be true."

It is for these reasons that, while there are countless dicta honoring the rule of Derry v. Peek, decisions actually holding negligent misrepresentation not actionable are much less easily found. And it is for these same reasons that the actual state of the law of deceit is difficult to determine. In this connection, and speaking of the rule of Derry v. Peek, one commentator has stated that

"The majority [of the American courts] purport to accept it as sound law, but a great many of them have devised various more or less ingenious fictions and formulae which permit them to render lip service to Derry v. Peek, and yet allow recovery in deceit for misrepresentation which falls short of actual intent to deceive. If one looks to the facts of the cases rather than the formulae adopted by the courts, it is by no means clear that Derry v. Peek is supported by the weight of

American authority." Prosser, Torts, Sec. 88 at p. 537.

Aside from Shwab v. Walters, there appears to be no Tennessee case in which the question of liability in deceit for negligent misrepresentation is even touched upon. Indeed, the law of deceit in general seems to have had a rather inconclusive development in Tennessee. See McFarlane v. Moore, 1 Tenn. 174; Baker v. Seahorn, 31 Tenn. 54; Gibbs v. Odell, 42 Tenn. 132; Wynne v. Allen, 66 Tenn. 312; Horrigan v. First National Bank, 68 Tenn. 137.

There are three Tennessee cases, however, which are pertinent to the present situation by analogy, though decided without specific reference to the action of deceit. Dickle v. Nashville Abstract Co., 89 Tenn. 431, 14 S.W. 896; Denton v. Nashville Title Co., 112 Tenn. 320, 79 S.W. 799; Equitable Building & Loan Association v. Bank of Commerce & Trust Co., 118 Tenn. 678, 102 S.W. 901. In each of these cases suit was brought by a purchaser of land against a title company which, in preparing an abstract of title upon the land, had negligently overlooked certain defects of title. In each case the abstract was delivered by the title company to the vendor, after having been prepared at the latter's request, and thus came indirectly from the title company to the plaintiff.

The Dickle case allowed recovery, observing that the title company had known that the abstract was to be used as the basis of a sale of the land, and that this knowledge was sufficient to establish "privity of contract" between the title company and the immediate purchaser of the land. The Denton case approved this holding, but denied recovery for a loss which was found to have been caused only remotely by the defective abstract. Finally, in the Equitable case, the Court denied recovery for lack of privity in a situation where the title company had no knowledge of the purpose for which its abstract was to be used.

Unfortunately, these cases are not direct authority upon the question of whether an action of deceit may be maintained for a negligent misrepresentation, because actions of deceit were not involved there. The Dickle case arose from a suit in equity for an accounting, and the Denton and Equitable cases appear to have involved similar suits.

On the other hand, these cases do not exclude the possibility of tort liability for negligent misrepresentation. To the contrary, aside from the obvious fictions of implied contract and privity, the actual and substantial basis of these cases was negligence, and it has been observed that "apart from outmoded theories of pleading no particular disadvantage can result if the remedy for negligent misrepresentation is incorporated in the action of deceit." Prosser, Torts, Sec. 88 at p. 542. Finally, it may well be argued that, in appropriate situations, the following language from the Dickle case warrants recognition of a common law duty of care in representation, without reference to fictions of contract:

"The abstract company held itself out as competent to do the work, and it is well understood that purchasers rely upon the work of such corporations as security for the perfectness of title, and expect them to point out any defects.

\* \* \* \* \* \*

"To furnish abstracts of titles is a business. Parties undertaking it assume the responsibility of discharging its duties in a skillful and careful manner."

Another consideration which may be mentioned in this regard is that negligent misrepresentations resulting in physical harm or property damage, as distinct from financial loss for business transactions, are frequently held actionable in other jurisdictions. Thus it has been held that a negligent assurance that a bridge is safe (Washington & Berkeley Bridge Co. v. Pennsylvania Steel Co., 4th Cir., 1915, 226 F. 169), or that there

is no danger from blasting operations (Valz v. Goodykoontz, 1911, 112 Va. 853, 72 S.E. 730), or that there is no danger from smallpox germs upon a premises (Jones v. Stanko, 1928, 118 Ohio St. 147, 160 N.E. 456) may impose liability. Likewise in a similar case involving a personal injury the Supreme Court of Tennessee in the case of Southern v. Cowan Stone Co., 188 Tenn. 576, 221 S.W.2d 809 (1949) asked the rhetorical question

> "Why should one be allowed to mislead either intentionally or through negligence, another to his harm and not be answerable therefor?"

As intimated by this language, there would seem to be no valid reason for making liability for misrepresentation contingent upon the type of injury which it causes, so long as that injury is real, and this consideration has led some courts to reject the rule of Derry v. Peek. See Prosser, Torts, Sec. 32 at p. 144 and Sec. 88 at p. 542.

In summary, nothing appears in the law of Tennessee which would exclude tort liability in deceit for negligent misrepresentation. In fact, the Tennessee courts have made some concession in favor of such liability by acknowledging in Shwab v. Walters that a misrepresentation made "recklessly, careless whether it be true or false" may be actionable in deceit. Further, encouragement for recognizing tort liability for negligent misrepresentation may be found in the title company cases discussed above, and in the fact that negligent misrepresentation resulting in tangible harm is held to be actionable. Further still, close scrutiny of other American cases purporting to hold negligent misrepresentation not actionable, reveals that they do not actually so hold, and that, as stated by Prosser, "it is by no means clear that the rule of Derry v. Peek is supported by the weight of American authority."

Thus the question resolves itself into one of whether there is any valid reason for pretending that only fraud will support an action of deceit, while permitting recovery upon proof of much less than fraud. Such a rule does permit ostensible observance of the doctrine of stare decisis while enabling courts to do justice from case to case. Green, Deceit, 16 Va.L. Rev. 749. On the other hand, "There is, of course, not so much to be said for the resulting unpredictability of decisions." Prosser, Torts, Sec. 88 at p. 537, n. 52. Similarly, there is little to be said for a rule which permits and even encourages courts to stigmatize as fraudulent conduct which is merely negligent. Finally, one may question the wisdom of a rule which has the seemingly unjustifiable result of shielding from liability the defendant whose negligent statements result in financial ruin to the plaintiff, while holding fully accountable the defendant whose similar statements result in personal or property injury to the plaintiff.

For these reasons the Court holds that an action should be allowed for negligent misrepresentations with regard to business transactions when damages proximately occur from justifiable reliance thereon. This view has been adopted by the American Law Institute and is set forth in Sec. 552 of the Restatement of the Law of Torts as follows:

> "One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if
>
> (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and
>
> (b) the harm is suffered
>
> (i) by the person or one of the class of persons for whose guidance the information was supplied, and
>
> (ii) because of his justifiable reliance upon it in a transaction in

which it was intended to influence his conduct or in a transaction substantially identical therewith." Restatement, Torts, Sec. 552.

■ Although the defendants have admitted the omission of the percentage of core recovery information, whether such omission can be said to be a failure on the part of the defendants to use due care depends upon whether such information can be considered as material information. Obviously even though the defendants did omit this information, if the matter omitted could be of no geological significance to persons in the position of the plaintiff, its omission could not be a failure on the part of the defendants to use due care. It is contended by the defendants that the omission was not material, as the information would be of no value or significance to a bidder such as the plaintiff. Moreover it is further contended by the defendants that Exhibit No. 4 verbally described the material to be encountered at the tunnel level in Test Bores 31 and 32, and that this verbal description was both a correct report of the information from the drillers' report (Exhibit No. 6) and corresponded with the materials actually encountered by the plaintiff in digging the tunnel in the area of these test bores, so that correct geological information was provided by Exhibit No. 4 and the omission of the percentage of core recovery was therefore an omission of unnecessary and immaterial information.

■ With regard to the information of the percentage of core recovery being of no value to bidders, the Court cannot agree with the defendants' contentions in this regard. From a consideration of all of the evidence, it appears that the plaintiff has carried the burden of establishing that the information would be of significant and therefore material value to a bidder. While it is true that Professor Van Cleve, a recognized authority in the field of geology, Mr. Leland Grant, also a geologist of repute, and Mr. Schmidt, an engineer, were of the opinion that where the percentage of core recovery ran as low at tunnel level as it did in Test Bores 31 and 32, being 30% in Test Bore 31 and 23% in Test Bore 32, the information would be of no significance, a number of likewise reputable witnesses held a contrary view. Not only did Mr. Turner and Mr. Murphy, officers of the plaintiff, attach considerable significance to this information as a basis for estimating costs, but also Mr. Whittle, a competing tunnel contractor did, as did Professor Sowers, a consulting engineer of the firm of Law-Barrow-Agee, Mr. Stein of the Stein Construction Company, Mr. Fox, a reputable geologist, who described it as a "serious mistake," Mr. Peerson, a consulting engineer, who described it as "very important" to contractors to put this information on the drawings, and Mr. Ordway, one of the partners in Havens and Emerson and a defendant in this suit, who testified that the information should have been put on the drawings.

With regard to the contention of the defendants that the omission of the percentage of core recovery was immaterial, as correct geological information was otherwise provided by verbal description of materials to be encountered, the Court likewise cannot agree with the contention of the defendants. Although the Court is of the opinion and does find that the materials verbally described in Exhibit No. 4 were substantially the same materials as were actually encountered in digging the tunnel in the area of the test bores, the evidence likewise preponderates in support of a finding that, although the verbal description of materials on Exhibit No. 4 was correct, it made a substantial difference from a contractor's view point whether the materials were diamond cored or removed by "fishtail" or earth boring, and that the percentage of core recovery would reveal to the contractor that core drilling or diamond boring was necessary. As testified to by Mr. Peerson, a consulting engineer, the materials verbally described on Exhibit No. 4 at Test Bores 31 and

32 would be entirely different if it was known on the one hand that they were diamond cored or on the other hand that they were removed by earth boring. This conclusion was supported by the testimony of other witnesses. As testified by officers of the plaintiff, the absence of any information with regard to core recovery or diamond boring at the tunnel level in Test Bores 31 and 32 caused them to believe that the tunneling in that area could be accomplished by earth boring methods as distinguished from rock blasting and drilling.

The Court is of the opinion that although the evidence in this case does not warrant a holding that the defendants were guilty of fraudulent withholding of information or reckless, in the sense of willful or wanton, misrepresentation, the evidence does support a finding that the defendants, in omitting information of the percentage of core recovery, did fail to use the care that might be reasonably expected of them as engineers and professional persons. The weight of the evidence would appear to bear out a finding that such an omission was a lack of due care. Even Mr. Ordway, one of the defendants, admitted that he believed the information should have been included upon Exhibit No. 4.

■ Before it can be determined whether the failure of the defendant to exercise due care was negligence, it is necessary to determine whether the defendants owed any duty to the plaintiff with regard to the information omitted. The defendants contend that there is no privity as between them and the plaintiff, that they were employed by the City of Chattanooga and that they furnished Exhibit No. 4 to the City of Chattanooga. The defendants further rely upon the fact that Exhibit No. 4 expressly stated upon its face that

"This information is furnished for the convenience of bidders and is not a part of Contract 15. This information is not guaranteed and any bids submitted must be based on the bid-der's own investigations and determinations."

■ Dealing first with this disclaimer and its effect, it appears in the body of the disclaimer that it was contemplated that the drawing would be furnished to bidders. It was further testified by several witnesses that it was customary for bidders to rely upon such drawings, even in the face of such disclaimer. Finally, Mr. Ordway, one of the defendants, testified that he knew that the drawing would be furnished to bidders, including subcontractors. It appears, and the Court finds, that the defendants could reasonably foresee that the drawing would be furnished to and relied upon by bidders in spite of the disclaimer. For these and other reasons discussed below the disclaimer would therefore not operate to eliminate a duty of due care as between the defendants and the plaintiff, but rather would go to the issue as to whether the plaintiff himself exercised due care in relying upon the drawing and the disclaimer will be considered further with regard to the issue of contributory negligence.

■■ Returning now to consider the defendants' contention that no duty was owed to the plaintiff as no privity existed between the parties, the Court is of the opinion that privity is not a prerequisite to the existence of a duty under the tort law of negligence. It is well settled that no privity of contract between the plaintiff and the defendant need be shown to render one liable for a fraudulent misrepresentation. 23 Am. Jur., Fraud and Deceit, Sec. 187. Likewise by analogy, it is now held in Tennessee that privity is not a prerequisite to the existence of a duty in a products liability case founded upon negligence. Dunn v. Ralston Purina Co., 38 Tenn. App. 229, 272 S.W.2d 479.

■ Rather than privity, which is a consideration dealt with primarily in the field of contracts, the real issue in this regard is whether a duty to refrain from negligent misrepresentations may be

owed to a plaintiff who receives the misrepresentations through an intermediary.

As indicated above, the American Law Institute, in the Restatement of Torts, has answered this question in the affirmative, provided "the harm is suffered by the person or one of the class of persons for whose guidance the information was supplied, and because of his justifiable reliance upon it [the misrepresentation] in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith." Restatement, Torts, Sec. 552(b).

On the other hand, a contrary view has been taken by an able New York court which first held more or less without qualification that an action of deceit might be maintained for a negligent misrepresentation indirectly transmitted to the plaintiff (Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425), and then later modified this ruling by holding that liability attaches in such situations only when reliance upon the representation by a specific plaintiff is contemplated by the defendant at the time of the making of the representation. Ultramares Corporation v. Touche, 255 N.Y. 170, 174 N.E. 441.

It appears that the disparity between the New York and Restatement positions is occasioned by differing views of both practical and legal considerations. The practical consideration which troubled the New York court appears from the following language in the Ultramares case:

> "Liability for negligence if adjudged in this case will extend to many callings other than an auditor's. Lawyers who certify their opinion as to the validity of municipal or corporate bonds, with knowledge that the opinion will be brought to the notice of the public, will become liable to the investors, if they have overlooked a statute or a decision, to the same extent as if the controversy were one between client and adviser. Title companies insuring titles to a tract of land, with knowledge that at an approaching auction the fact that they have insured will be stated to the bidders, will become liable to purchasers who may wish the benefit of a policy without payment of a premium. These illustrations may seem to be extreme, but they go little, if any, farther than we are invited to go now."

Without passing upon matters not before the Court, it may be observed in this connection that there have been significant changes in the American society during the 30 years that have elapsed since the decision in the Ultramares case. The continued growth and expansion of industry, the growth of population, the urbanization of society, the growing complexity of business relations and the growing specialization of business functions all require more and more reliance in business transactions upon the representations of specialists.

And there are other practical considerations of significance here. Thus it has been observed that under the rule followed in New York, " * * * the accountant [or other maker of a business representation] is left in a situation in which he requests reliance, demands a premium for his certification because of the reliance which it induces, and then seeks to avoid liability arising from the reliance." Richardson, the Influence of Accountants' Certificates on Commercial Credit, 1913, quoted in Prosser, Torts, Sec. 88 at p. 545, n. 31. Further, the New York rule has the effect of placing the burden of loss, as between the negligent maker of a misrepresentation and the plaintiff, upon the latter, though he be both injured and innocent.

Finally, the trepidation expressed by the New York court at the unlimited areas of liability which it was "invited" to recognize, may be no more than a tilting at windmills. Again without passing upon matters not now before the Court, it may be observed that there are methods

for limiting liability for negligent misrepresentation which are less artificial and less drastic than the rule adopted in the Ultramares case. Thus, to cite only one example, it is suggested in Comment g following Section 552 of the Restatement of Torts, that the liability of the maker of the representation may vary according as he authorizes transmission of his representation to one person only, or to a class of persons, and according as the reliance comes in a transaction of the type which it was intended to influence. Cf. Hawkins, Professional Negligence Liability of Public Accountants, 12 Vand.L.Rev. 797, 819.

For these reasons, then, it is believed that practical considerations alone will not justify the Court in adopting the rule of the Ultramares case.

The legal consideration referred to in that case was, of course, the problem of foreseeability. It was felt improper to extend liability for merely negligent misrepresentation to a plaintiff whose reliance thereon the defendant could not specifically anticipate. This represents a rather strict application of the concept of foreseeability. A more liberal approach is found in the very generally held view that the unforeseeability of a particular injury does not affect the responsibility therefor of the defendant who causes it, at least not if the injury was of a type or class of injuries which could have been foreseen as a potential result of the defendant's conduct. State ex rel. Harbin v. Dunn, 39 Tenn.App. 190, 282 S.W.2d 203; 38 Am.Jur., Negligence, Sec. 62. There would seem to be no valid reason for holding the defendant responsible for injuries which are not specifically foreseeable, but not to plaintiffs who are not specifically foreseeable.

The holding in the Ultramares case may partly be explained by the fact that it was decided by the same court which had previously decided the famous case of Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253, holding that, except in cases of ultrahazardous or willfully dangerous conduct where public policy requires a different result, there can be no duty and hence no negligence toward an unforeseeable plaintiff.

A more reasonable solution to this problem, and one which constitutes no innovation in the law of negligence, is to hold that a duty is owed to the class of persons which a given act may foreseeably affect, as distinct from a plaintiff who is individually foreseeable. It is well settled for example that a statute prescribing a standard of conduct creates a duty in favor of the class of persons which the statute was designed to protect. 38 Am.Jur., Negligence, Sec. 165. And cf. Hindman v. First National Bank, 6 Cir., 98 F. 562, 48 L.R.A. 210; Hindman v. First National Bank, 6 Cir., 112 F. 931, 57 L.R.A. 108, certiorari denied 186 U.S. 483, 22 S.Ct. 943, 46 L.Ed. 1261; Davis v. Louisville Trust Co., 6 Cir., 181 F. 10.

Moreover, this solution would seem to be supported by Jackson v. B. Lowenstein & Bros., Inc., 175 Tenn. 535, 136 S.W.2d 495, a case said to have rejected the Palsgraf doctrine (Prosser, Torts, sec. 36 at p. 170, n. 40), but believed by this Court merely to have modified the same. It is doubted that the Jackson case rejected the principle that "The risk reasonably to be perceived defines the duty to be obeyed * * *." Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 162 N.E. 99, 100, quoted with approval in Justus v. Wood, Tenn., 349 S.W.2d 793, 794. Rather it is believed the Jackson case held that this principle is to be applied by the jury rather than by the Court, and, by necessary implication, that it may be applied to foreseeable classes of persons, as well as to individually foreseeable plaintiffs.

The Court therefore concludes that, as between the Restatement view on the one hand, recognizing responsibility to foreseeable classes of persons, and the Ultramares view on the other, requiring foreseeability as to the specific plaintiff, the former is more consonant with the legal and practical considerations obtaining in Tennessee today.

The Court's conclusion in this regard is not altered by the fact that an argument in favor of liability only to specifically foreseeable plaintiffs might be based by analogy upon the concept of privity approved in the Tennessee title cases discussed above. The only one of these cases to deny recovery for lack of privity was Equitable Building & Loan Association v. Bank of Commerce & Trust Co., 118 Tenn. 678, 102 S.W. 901, and the analogy between the factual situations of that case and the present one fails at this point, because the court there made the express finding, however dubious, that the defendant title company had had no knowledge of the use to which its abstract was to be put. In the present case, on the other hand, the Court in its capacity as the trier of fact has heretofore found that the defendants, Havens and Emerson, knew and foresaw the use to which Exhibit No. 4 would be put and the class of persons who would rely upon it in transactions of the type which the representation was intended to influence.

Having concluded that an action for negligent misrepresentation with regard to business transactions may be maintained and that the duty of the defendant in this regard extends to the class of persons whose reliance upon and injury by the misrepresentations can reasonably be foreseen, the Court is of the opinion that the evidence in this case preponderates in favor of a finding that the defendants, Havens and Emerson, were guilty of negligence in omitting from Exhibit No. 4 the information as to the percentage of core recovery.

It further appears that this negligence was the proximate cause of the loss and damage to the plaintiff. It is undisputed that Exhibit No. 4, the drawing of the defendants, was delivered to the plaintiff as one of the documents to be considered in preparing its bid. The officers of the plaintiff who prepared the bid testified that they did rely upon it in preparing their bid and specifically that they relied upon the absence of any diamond core drilling or core recovery being reflected in Test Bores 31 and 32 at tunnel level.

Since the defendants are charged with negligence, it must next be determined if the plaintiff was guilty of contributory negligence. In this regard it is insisted by the defendants that the plaintiff was put on notice by the disclaimer on the drawing to make their own investigation, and that the information on the drawing was not guaranteed, but that in the face of this warning the plaintiff proceeded to submit its bid without making core drillings of its own, without an inquiry as to the core samples from the City, without inquiry as to other tunneling experience in the Chattanooga area and without otherwise seeking to inform itself of the geological conditions which might affect its bid. It does appear undisputed that the plaintiff did not make test drillings upon its own. However, the Court cannot see that its actions were unreasonable in this regard. The expense and time involved would have been considerable. Moreover, the plaintiff had, in Exhibit No. 4, what it reasonably believed to be a reliable report of test drillings. It further appears undisputed that the plaintiff made no inquiry of the City, whom it knew to be the owner, with regard to any geological information or with regard to any test bore core samples, and that it made no inquiry as to other tunneling experience in the Chattanooga area. The plaintiff did go to the tunnel site and examine exposed chert beds in the vicinity of the tunnel to determine the nature of "chert" as described in the drawing.

It further appears that the plaintiff did make some inquiry of Mr. Buerman, a representative of Havens and Emerson, as to the identity of the person or firm making the test bore drillings, but that through a misunderstanding as to whether the plaintiff was inquiring for the identity of the drill operator or the identity of the firm performing the drilling, Mr. Buerman was unable to give him this information. The court does not believe that the evidence would warrant

**836**

a finding of contributory negligence upon the part of the plaintiff.

 There remains the issue of determining the damages. The proper measure of damages in a negligent misrepresentation case such as this would be the difference between the amount which the plaintiff bid and the amount the plaintiff would have bid but for the negligent misrepresentation. See Shwab v. Walters, 147 Tenn. 638 at 645, 251 S.W. 42. The amount that the plaintiff would have bid in this instance however is actually unknown even to the plaintiff. The plaintiff contends that it would have doubled its bid. This statement is obviously based, however, upon the plaintiff's experience in digging the tunnel, in which the total cost apparently ran approximately double what the plaintiff had anticipated. The plaintiff contends that it estimated the job could be completed in 18 weeks and based its bid accordingly, whereas the work actually took 34 weeks. However, it cannot be said that the evidence supports a finding that all of this delay was caused by any mistake or omission with regard to geological information in the vicinity of Test Bores 31 and 32. In attempting to reconstruct what the plaintiff would have bid, the Court believes that the only reasonable rule would be to assume that the bid would have been increased to the extent of any delay or additional costs occasioned in the vicinity of Test Bores 31 and 32 by reason of unanticipated geological conditions, which mistaken geological assumptions were caused by the omission in Exhibit No. 4.

 In preparing its bid Texas Tunneling Company calculated its costs per week, then multiplied this by the number of weeks estimated for completion of the job. The plaintiff estimated that 18 weeks would be sufficient to complete the job. The geological information was taken into consideration in estimating the weeks to be involved, not the average weekly cost. Thus a change in geological information would affect the bid by increasing or decreasing the estimate of weeks involved, not by increasing or decreasing the weekly cost.

On the basis of the plaintiff's testimony that 18 weeks was used in preparing the bid as the time that would be required to drive the 976 foot tunnel, it appears that an average progress of 54.22 feet per week was contemplated. It further appears from the testimony and from plaintiff's Exhibit P–28 that the plaintiff unexpectedly encountered very hard materials in the vicinity of Test Bores 31 and 32 only from Station 38+89 to Station 41+76, or a total of 287 feet. On the basis of average progress of 54.22 feet per week, the plaintiff would have completed this tunneling in 5.5 weeks had average progress been made.

Approximately one-half of the tunnel was driven from the first, or east portal, going from Station 45+00 to Station 40+51, this work being accomplished between the dates of March 6 through July 17. Thereupon work was begun at the other end, the second or west portal, and the tunnel was driven from Station 35+24 until it joined at Station 40+51, this work being accomplished between the dates of July 18 through November 18. The daily log of the inspectors (Exhibit No. 7) indicates that tunneling from Station 38+89 to Station 40+51 was accomplished in the period from October 8 through November 18 and that the tunneling from Station 41+76 to Station 40+51 was accomplished in the period from June 15 through July 17, or a total of 10½ weeks. The total time therefore required to accomplish the tunneling in the area where erroneous geological information could have affected the plaintiff's estimate of time for completion was 10½ weeks. This exceeded the time anticipated in preparing the bid, had average progress been made through this area, by five weeks.

The full amount of this additional time could not be charged, however, to misinformation about geological conditions. The daily logs of the inspector, Mr. Hoover, (Exhibits Nos. 47 and 48) show approximately five days, or one work week, delay during the periods from June

15 through July 17 and October 8 through November 18 due to other causes. Moreover, due to the close tolerances as to line and grade required under the contract, the plaintiff elected, after beginning the tunnel, to enlarge the area dug from a diameter of nine feet to a diameter of nine feet six inches, or a 10.2% increase in the area excavated. Thus 10.2% of the time spent in driving the tunnel from Station 38+89 through Station 41+76 was caused by the plaintiff's election to enlarge the tunnel, not by any misinformation about geological conditions. As a total of 10½ weeks was spent in driving the tunnel from Station 36+89 to Station 41+76, this would involve 1.07 weeks (10.2% times 10.5 weeks) that should be deducted. Therefore, after deducting one week for delays other than those attributable to geological conditions encountered and after deducting 1.07 weeks as the additional time required by reason of the plaintiff's election to enlarge the tunnel, a total of eight and one-half weeks remains as the time required to drive the tunnel the 287 feet through the area involving Test Bores 31 and 32 where it appears that difficult geological conditions were encountered which might otherwise have been anticipated had no omission been made upon Exhibit No. 4.

On the basis of the plaintiff's bid of $109 per foot and the estimated average rate of progress of 54.22 feet per week, the average weekly cost used by the plaintiff in preparing its bid would figure $5910 per week. As found by the Court above, the increased time reasonably attributable to any change in geological conditions from those anticipated would amount to three weeks (10½ weeks less 5½ weeks anticipated, less two weeks due to other causes) under the record in this case. Multiplying this by the average weekly cost of $5910, it appears that the plaintiff's damages would be in the sum of $17,730. A judgment in this amount will be entered against the defendants, Havens and Emerson.

This opinion will constitute the Court's findings of fact and conclusions of law. An order will enter accordingly.